David ALVARADO et al., Plaintiffs,

v.

EL PASO INDEPENDENT SCHOOL
DISTRICT et al., Defendants.

No. EP–70–CA–279.

United States District Court,
W. D. Texas,
El Paso Division.

Dec. 23, 1976.

Joaquin G. Avila, Joel Contreras, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., Albert Armendariz, Sr., El Paso, Tex., for plaintiffs.

Harold L. Sims, Morris A. Galatzan, Grambling, Mounce, Deffebach, Sims, Hardie & Galatzan, Michael Ainsa, El Paso, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, District Judge.

This cause having been tried to the Court from December 8 through December 19, 1975, and upon due consideration of the pleadings filed herein, the exhibits introduced at trial, the testimony elicited at trial, and information obtained by the Court in its post-trial inquiry, the Court hereby issues the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Defendant, El Paso Independent School District, was created on February 12, 1962, by action of the County Board of School Trustees of El Paso County, Texas, pursuant to and as authorized by Chapter 407, Acts of the 57th Legislature of Texas, and such new entity then succeeded to all of the prior rights, titles, interests, powers, duties and responsibilities theretofore held by and incumbent upon its predecessor, "The Independent School District of the City of El Paso". (D.Exh.A; testimony, J. M. Whitaker)

2. The Independent School District of the City of El Paso was created on November 14, 1882. (P.Exh. 350E, El Paso Herald, May 12, 1923, p. 6D)

3. Olivius V. Aoy established a private school for the education of Mexican-American students in 1887. (P.Exh. 305, p. 5; P.Exh. 350, p. 47) Until this time there was no school in El Paso for the education of Mexican-American students. (Statement, G. P. Putnam, Supt. School Dist., 1894–1903, P.Exh. 350E, El Paso Herald, May 12, 1923)

4. This school was incorporated by the School District in 1892 and was renamed "The Mexican Preparatory School". (P.Exh. 305, p. 6)

5. Alamo School was constructed in 1899 as a second Mexican School. (P.Exh. 350, El Paso Evening Post, May 30, 1928, p. 10) Alamo School was built specifically "to relieve the overcrowded conditions at Aoy". (P.Exh. 350E, El Paso Times, March 22, 1953) The School District at this point in time followed the statutorily-mandated state policy of providing separate facilities for Black students. Douglass School, the first "colored" school, was constructed in 1891. (P.Exh. 350, p. 53)

6. The Superintendent's Report for the year 1890, The School District Register for the year 1893–1894 and the scholastic census of 1883, compiled by Mr. James A. Ashford (P.Exh. 350E, El Paso Herald, May 12, 1923, p. 6D), indicate that the School District categorized its students in order to assure their placement in ethnically identifiable schools. (P.Exh. 184; 348 [1]; 498, Board Minutes, June 6, 1892; 498, Rental Sheet, Board Minutes, 1889–1890; 498, Board Minutes, May 6, 1895, July 25, 1895, June 3, 1895, March 25, 1924, p. 4)

7. Prior to 1922, school officials allowed ethnic and racial considerations to influence decisions with regard to the construction of schools. (P.Exh. 348–15, School Board Minutes, January 3, 1922; P.Exh. 188, Board Minutes, March 25, 1924, where the Board discussed possibilities of relief "in the Mexican Schools"; P.Exh. 188, Board Minutes, June 18, 1929)

8. By 1922 those elementary schools located south of the tracks, i.e., Aoy, Alamo, Beall, Franklin and San Jacinto were known as the Mexican District, while those elementary schools located north of the tracks, i.e., Alta Vista, Bailey, Grandview, Highland Park, Lamar, Morehead, Manhattan, Sunset and Vilas, were known as the American District. (P.Exh. 154, pp. 21, 22)

9. After the construction of El Paso High School in 1916, the School District established junior high schools at Alta Vista and at El Paso High School to serve the predominantly Anglo community. At the same time, a junior high school was established at San Jacinto to serve the predominantly Mexican-American community. (P.Exh. 154, pp. 21, 22; P.Exh. 350, p. 101; P.Exh. 154, pp. 21, 22)

10. The Bowie High School was established in 1927 at the site of the Guillen Elementary School by expanding Guillen's curriculum to include the higher grades. (P.Exh. 350, p. 105)

11. Austin High School was constructed in 1930. (D.Resp. to P.Interr. 25G)

12. In 1934 El Paso High matriculated students from the following elementary schools, all of which were predominantly Anglo-American: Bailey, Dudley, Lamar, Morehead and Vilas. Austin High School matriculated students from the following schools, all of which were predominantly Anglo-American: Alta Vista, Coldwell, Crockett, Houston and Rusk. Bowie High School matriculated students from the following schools, all of which were predominantly Mexican-American: Alamo, Aoy, Beall, Burleson, Franklin, Lincoln Park, San Jacinto and Zavala. (O. W. Borrett Report, P.Exh. 155, pp. 1–4)

13. As a result of an influx of Mexican Nationals and expanding development of the railroads, the population of El Paso grew from 40,000 in 1910 to 78,000 in 1920. (Testimony, J. Cunningham, Dir., Dept. of Planning and Research, City of El Paso, Texas)

14. The pattern of immigration and growth continued into the 1930's and the 1940's and accelerated during World War II. (Testimony, J. Cunningham)

15. The population of the City of El Paso grew from 130,000 in 1950 to 276,000 in 1960 and 325,000 in 1970. This growth resulted from an acceleration of military activities at the White Sands Missile Range and Fort Bliss as well as from the development of clothing manufacturing industries in El Paso. This great increase in population placed an added strain on all public

services, including public schools. (Testimony, J. Cunningham)

16. El Paso's center of population density is presently located north of Interstate Highway 10 and east of Bassett Shopping Center, northeast of south El Paso. (Cross-examination, Dr. Fields by Mr. Sims)

17. By 1970 the Mexican-American population was 187,296, or approximately 56.5% of the total El Paso population of 322,261. (Testimony, Dr. Rabin)

18. Mexican-American citizens and immigrants traditionally settled in south and southeast El Paso, primarily because of these areas' cultural attachment to Ciudad Juarez, Mexico, and the availability of low cost housing there. However, in recent years there has been a gradual dispersal of the Mexican-American population from the areas of El Paso contiguous to the international border to all geographical areas of the city. The north and northeast sections of the city have felt the impact of this population shift, though they remain predominantly Anglo-American in ethnic composition. (D.Exh.J and P; testimony, J. Cunningham, B. E. Schwarzbach, Sr., C. F. Hart, Jr., J. M. Whitaker, E. Chapa, H. E. Charles, Eduardo Molina; testimony, Dr. Rabin)

19. This natural northward flow of Mexican-American people has caused and will cause a better ethnic balance in almost every school. (D.Exh.J, K, L, M and P; testimony, C. F. Hart, Jr., J. Cunningham, B. E. Schwarzbach, Sr.)

20. Historically and currently, the influx of Mexican immigrants to south and southeast El Paso is a unique phenomenon which has required the Defendant School District to accommodate a disproportionate number of minority students compacted into a relatively small geographic area. (Testimony, J. Cunningham, J. M. Whitaker, E. Chapa)

21. The acts enumerated above in Findings of Fact Nos. 3 through 12, at the time done, caused the ethnic isolation of Anglo-American and Mexican-American students. These acts and policies, proved by convincing evidence, are indicative of past intent on the part of the present Defendant's predecessor entity to maintain and foster a dual school system. However, the Court finds that the extant level of ethnic isolation within the El Paso Independent School District is, with certain exceptions to be noted below, a result of the population expansion cited in Findings Nos. 13 through 20, and may not be attributed to any intentional act of the Defendant School District. (D.Exh.J, K, L, M and P; testimony, C. F. Hart, Jr., J. M. Whitaker, E. Chapa, H. E. Charles)

## STUDENT ASSIGNMENT

Intentional Acts on the Part of Defendant School District which Caused Ethnic Isolation of Anglo-American and Mexican-American students.

22. The establishment of attendance zones for the following schools had segregative consequences:

A. Roberts Elementary School. (Testimony, Dr. Fields; P.Exh. 151H, Map 71, Map Overlay 71C; and D.Exh.Map P)

B. Dowell and Schuster Elementary Schools. (D.Exh.Map 71, Overlay 71C; P.Exh. 151H; D.Exh.Map P)

C. Travis and Bliss Elementary Schools. (P.Exh.Map 71, Overlay 71C; Testimony, Dr. Fields; D.Exh.Map P)

D. Establishment of the western boundary of Fort Bliss as the attendance zone line between Austin High School and Burgess High School. (Testimony, Dr. Fields; P.Exh.Map 71, Overlay 71C, 151H; D.Exh.Map P)

23. The construction of the new Bowie High School in 1973 fostered and continues to foster ethnic isolation of Mexican-Americans. (D.Exh. D, Map P)

24. The construction of Roberts Elementary School in 1961 at 341 Thorne Avenue fostered and continues to foster ethnic isolation of Mexican-Americans. (D.Exh. D, Map P)

25. The transportation of students from Fort Bliss to Logan Elementary School and

Burgess High School by means of the following bus routes had segregative consequences:

A. Bus route 3, trips 1, 2 and 3, which transported 140 students in 1969–1970 from the Fort Bliss area to Logan School, a predominantly Anglo-American school, while Burnet School, a predominantly Mexican-American school, was .5 mile closer to the area in which the students lived. (Court's Post Trial Exh. 8)

B. Bus route 8, trips 1 and 2, which transported 101 students in 1969–1970 from the predominantly Anglo-American area just west of the Fort Bliss Golf Course and near the Logan School to Burgess High School, a predominantly Anglo-American school, rather than transporting them to Austin High School, a predominantly Mexican-American school, which was 3.4 miles nearer their residences. (C.P.T.Exh. 9)

C. Bus route 9, Trip 1, which in 1969–1970 transported 71 students residing within the bounds of Airport Road, Haan Road, Pershing Road, Forrest Road and Ricker Road to Burgess High School, a predominantly Anglo-American school, when Austin High School, a predominantly Mexican-American school, was 1 mile nearer the residences of those students who lived in the area bounded by the following streets: Jeb Stuart Road, Haan Road, Pershing Road and Forrest Road.

D. Bus Route 16, Trip 1, which in 1969–1970 transported to Burgess High School 71 students living in an area on Fort Bliss bounded by the following streets: Airport Road, Ricker Road, Forrest Road, Pershing Road, Pershing Circle, Sheridan Road, Pleasanton Road and Robert E. Lee Road. The distance from the intersection of Pleasanton Road and Robert E. Lee Road to Burgess High School is approximately 3.4 miles, while the distance from that point to Austin High School is approximately 1.5 miles. (C.P.T.Exh. 13)

E. Bus route 17, Trip 1, which in 1969–1970 transported 53 students to Burgess High School from the area south of Fred Wilson Road, north of Hayes Avenue, and east of Dyer Street. The distance from the intersection of Sheridan Road and McCullough Road to Burgess High School is approximately 6.1 miles while the distance from that point to Austin High School is approximately 1.9 miles. (C.P.T.Exh. 14)

F. Bus route 20, Trip 1, which in 1969–1970 transported 45 students from the area bounded by Sommerville Road, Haggerty Road, W. S. McNair Road, and Marshall Road to Burgess High School. The distance from the intersection of Sommerville Road and Marshall Road to Burgess High School is approximately 5.3 miles, while the distance from that point to Austin High School is approximately 2.2 miles. (C.P.T.Exh. 15)

26. Although bus routes 17 and 20 no longer transport students residing in the Fort Bliss area to Burgess High School, bus routes 3, 8, 9 and 16, which transport students from the Fort Bliss area to Logan Elementary School and Burgess High School remain the same, with some modification in the specific streets traveled by routes 8, 9 and 16. (C.P.T.Exh. 25, 26, 27, 28)

27. In 1974–1975, 26.828% or 499 students of the 1,860 students comprising the Burgess High School enrollment lived on Fort Bliss. One hundred or approximately 20% of this number were of minority extraction. (C.P.T.Exh. 17A)

28. In 1975–1976, 23.224% or 435 students of the Burgess High School enrollment of 1873 lived on Fort Bliss. Ninety-eight or approximately 23% of this number were of minority extraction. (C.P.T.Exh. 17B)

29. In 1974–1975, 0.963% or 29 of the 3001 students enrolled at Austin High

School lived on Fort Bliss. None of this number were members of a minority group. (C.P.T.Exh. 17C)

30. In 1975–1976, 0.798% or 24 of the 3006 students enrolled at Austin High School lived on Fort Bliss. Four or approximately 16% of this number were members of a minority group. (C.P.T.Exh. 17D)

Intentional Acts on the Part of Defendant School District Which had Segregative Consequences Causing Ethnic Isolation When Done But Which Have Later Been Remedied by Defendant School District

The following acts manifested segregative intent on the part of the El Paso Independent School District, but their effects have either been attenuated by the passage of time or specifically remedied by the Defendant School District:

31. Prior to June 1955, the El Paso Independent School District, as mandated by State law, maintained and operated a segregated school for Negro children only. In June of 1955 the El Paso Independent School District desegregated promptly following the Supreme Court decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and with regard to Negroes the School District remains and is a desegregated, unitary school system. (D.Exh.N; testimony of all D. witnesses except B. E. Schwarzbach, Sr.)

32. The busing of Mexican-American students from the "flashlight" area of northwest El Paso to Jones School, bus route 1, trip 1, had segregative consequences that were remedied by the closing of Jones Elementary School. (P.Exh. 343, p. 43; C.P.T.Exh. 5, 6; D.Exh.L, Map P)

33. Bus route 7, trip 2, which in 1969–1970 transported 74 students (68 Mexican-Americans) from the Smeltertown area to El Paso High School, a distance of approximately 9.5 miles, while the distance from Smeltertown to Coronado High School by going on Doniphan Drive to Crossroads and then on North Mesa to Coronado High School is approximately 6.84 miles. The Smeltertown area has been abandoned since 1971–1972. (P.Exh. 343, p. 44; distance computed on map attached to C.P.T.Exh. 6)

34. Similarly, bus route 11 which in 1969–1970 transported 121 Mexican-Americans in two trips from the Sunland Park area to El Paso High School, a one-way distance of 13 miles, had segregative consequences. The distance from the Sunland Racetrack area to Coronado High School by traveling on Doniphan to Crossroads and then on North Mesa to Coronado High School is approximately 3.84 miles. (P.Exh. 343, p. 44; distance computed on map attached to C.P.T.Exh. 6)

35. The maintenance of the Jones Elementary School attendance zone as part of the El Paso High School zone, even though many of the students in the Jones School zone lived closer to Coronado High School than to El Paso High School, had segregative consequences. This situation was remedied by the closing of Jones Elementary School in July 1971. The students who had attended Jones Elementary School were sent to Lincoln School and Morehead School, both predominantly Anglo-American schools. (P.Exh. 343, p. 37; C.P.T.Exh. 3, 5; D.Exh. L; Map P)

36. The establishment in 1963 of the Mesita Elementary School zone as an open zone between El Paso High School and Coronado High School in conjunction with the construction of Coronado High School and the liberal transfer policy fostered thereby allowed El Paso High School to become predominantly Mexican-American and Coronado High School predominantly Anglo-American. This segregative act by the Defendant School Board was remedied in 1971, however, when the Mesita zone became part of the El Paso High School zone. (P.Exh. 343, p. 37; D.Exh.Map P; D.Exh. L)

37. The establishment of open zones between Burgess High School and Austin High School and between Burgess High School and Jefferson High School served to draw Anglo-American students to Burgess High School from those other two high schools. This particular segregative act was remedied in 1971 by the elimination of

open zones and the establishment of fixed school attendance zones. (D.Exh. L)

38. The closing of Courchesne Elementary School in February or May of 1961 was an intentional act of segregation if the displaced students were sent to Jones School. However, the action then taken is of no present consequence because Jones School is now closed. All students at Jones were sent to Lincoln Elementary-Intermediate School, a predominantly Anglo-American school. (C.P.T.Exh. 3, 5; D.Exh.Map P; testimony, J. Cunningham, D. F. Hart and J. M. Whitaker)

39. The policy of issuing report cards written only in English was abolished in 1975–1976. All report cards issued by the Defendant School District, with the exception of high school report cards, are now written in both English and Spanish. The Defendant School District utilizes numerous other bilingual communications. (D.Exh.A, H–S–1 through H–S–34, I–1 through I–32, V–1 through V–4; D.Exh. AAA–1 through AAA–3; testimony, H. Polk, K. Allen Johnson)

40. The maintenance of separate athletic districts by the Defendant School District was abolished effective September, 1976. (D.Exh.O, O–1; testimony, J. M. Whitaker, C. F. Hart, Jr.)

41. Although Defendants at one time permitted "freedom of choice" to attend the school of a student's or parents' choosing, the Defendants no longer pursue such a policy and students are required to attend a neighborhood school nearest their respective homes, except in a few isolated instances where permission to attend other schools has been granted based on medical, psychiatric or other extraordinary circumstances. Defendants adopted a school assignment plan for high school students in December of 1970, and for elementary school students in January of 1971. Each of said plans is a zone plan presenting the neighborhood school concept; the attendance zone lines were drawn to encompass residential areas surrounding the various schools in an effort to place the students nearest their homes, consistent with the capacities of various school buildings, natural barriers, major thoroughfares and the like. (D.Exh.J, K, L, M, P)

Acts on the Part of Defendant School District Which Did Not Have Segregative Consequences

The following acts may not be viewed as manifestations of segregative intent on the part of the El Paso Independent School District:

42. The addition to Wainwright Elementary School in 1956 and the construction of Canyon Hills Intermediate School in 1972 were not intentionally segregative acts on the part of the Defendant School District. These schools are within the cluster denominated by Dr. Fields as Canyon Hills Intermediate School, Park Elementary School and Wainwright Elementary School. Canyon Hills Intermediate School was 27% Mexican-American in 1975. Park Elementary School, opened in 1961, was 18.32% Mexican-American in 1975. Wainwright Elementary School was 70% Mexican-American in 1975. Park Elementary School and Wainwright Elementary School are separated by the proposed north-south freeway and the differences in the percentage of Mexican-American students attending each of the three schools is not an indication that the schools were placed or constructed in such a manner as to have the effect of intentionally isolating Anglo-American and Mexican-American students. (Testimony, C. Hart, Jr., P.Exh. 151H, D.Exh.Map P)

43. The construction of Burnet Elementary School in 1953, the construction of an addition to Burnet Elementary School in 1965, and the construction of Logan Heights Elementary School in 1960 were not intentionally segregative acts on the part of the Defendant School District. The two schools are approximately 1.75 miles apart and are separated by Dyer Street and the proposed north-south freeway, both natural barriers. Burnet was 76.05% Spanish-surnamed in 1975, while Logan Heights was 7.14% Spanish-surnamed. (Testimony, C. F. Hart, Jr., P.Exh. 151H; D.Exh.Map P, Court's Trial Exh.Map 1)

44. The construction of the additions to Coldwell Elementary-Intermediate School in 1964, to Hillside Elementary School in 1964, and to Hawkins Elementary School in 1965 were not intentionally segregative acts on the part of the Defendant School District. Hillside Elementary School, containing 78% Spanish-surnamed students in 1975, Hawkins Elementary School, containing 97% Spanish-surnamed students in 1975, Coldwell Intermediate-Elementary School, containing 84% Spanish-surnamed students in 1975, and Milam Elementary School, containing 8% Spanish-surnamed students in 1975, are all within the cluster of Coldwell Elementary-Intermediate School. The four schools are separated from one another by Interstate 10 and the proposed north-south freeway, and the construction of additions thereto did not manifest segregative design on the part of the Defendant School District. (Testimony, C. Hart, P.Exh. 151H; P.Exh.Map 71, Map Overlay 71C; D.Exh.Map P)

45. No segregative consequences resulted from the 1970 additions to Henderson Intermediate School in southeast El Paso and Ross Intermediate School located just south of Fort Bliss. Ross Intermediate School, 38.27% Mexican-American in 1975, and Henderson Intermediate School, 86.44% Mexican-American, are 2 to 2.5 miles apart and are separated by Montana Street and Interstate 10. (P.Exh. 151H; P.Exh.Map 71, Overlay 71C; D.Exh.Map P; testimony, C. Hart, Jr.)

46. The closings of Lincoln Elementary School in 1969, Franklin Elementary School in 1972 and San Jacinto Elementary School in 1973 were not intentionally segregative acts on the part of the Defendant School District. Lincoln Elementary School was closed to accommodate State Highway construction, and Franklin Elementary School and San Jacinto Elementary School were closed due to high renovation costs. As these schools had predominantly Mexican-American populations when they closed, the transfer of the displaced students to other predominantly Mexican-American schools did not serve to isolate Anglo-American and Mexican-American students any more than before the closing of the schools. The concentration of Mexican-American students that existed in these three schools was not the result of any intentional act done by the Defendant School District. (Finding No. 21; testimony, J. Cunningham, C. F. Hart, Jr., and J. M. Whitaker)

47. No segregative consequences attached to the closing of Sunset School in 1925. At that time the area around Sunset was 8% to 15% Mexican-American in ethnic composition. (C.P.T.Exh. 5; P.Exh.Map 38)

48. The closing of Bailey School in 1945 did not have segregative consequences. The residential areas around Bailey were 6% to 35% Mexican-American at the time it was closed. (P.Exh.Map 69; P.Exh.Map Overlay 69A, 69B; C.P.T.Exh. 5)

49. The closing in 1948 of Dudley School, located in an area of 0% to 15% Mexican-American population, did not contribute to isolation of Mexican-American and Anglo-American school children. (P.Exh.Map 69, C.P.T.Exh. 5)

50. The site selection and construction of the following schools was in response to the growth of El Paso's population and does not reflect segregative design on the part of the Defendant School District: Burgess High School, opened in 1955; H. E. Charles Elementary School, opened in 1975; Carlos Rivera Elementary School, opened in 1975; and L. B. Johnson Elementary School, also opened in 1975. (Testimony, J. Cunningham, H. L. Schieman; deposition, H. E. Charles)

51. The construction of satellite schools or cottages at Cooley and Clardy Schools was not a segregative act. (Testimony, J. M. Whitaker; cross-examination, Dr. Fields, by Atty. Sims)

52. The use of portable classrooms at Jefferson High School was not an intentionally segregative act. (Dep. H. E. Charles; testimony, H. Polk; testimony, Carlos Vela)

53. The construction of the following schools evidences no segregative design by the Defendant School District: Burgess High School, constructed in 1955; Bassett

Elementary School, constructed in 1957; Crosby Elementary School, constructed in 1958; Stanton Elementary School, constructed in 1959; Irvin High School, opened in 1959; Andress High School, constructed in 1961; Coronado High School, constructed in 1962; and McArthur Elementary School, constructed in 1965. (Testimony, J. Cunningham, H. L. Schieman; P.Exh.Map 69, 69A, 69B, 70, 71, Overlays 71A, 71B, 151H; testimony, H. Polk, refuting Dr. Field's "under-utilization" theory)

54. Dr. Field's theory of classroom "under-utilization" is invalid as applied to the Defendant School District. (Testimony, H. G. Polk; See text of Opinion, Footnote 6, for detailed explanation of the under-utilization theory)

55. The following bus routes utilized by the El Paso Independent School District did not have segregative consequences (as so alleged by Plaintiffs):

A. Bus route 1, Trip 2 and 3, in 1969–1970. The distance from Courchesne School to old White School is approximately 2.5 miles and the distance from Courchesne School to Jones School, the destination of the bus trip, is 2.0 miles. (C.P.T.Exh. 7)

B. Bus route 9, Trip 2, which in 1969–1970 transported students from the Aero Vista area just north of the El Paso International Airport to Burgess High School. The distance from the intersection of Luke Road and Fred Wilson Road to Burgess High School is approximately 5 miles while the distance from that point to Austin High School is approximately 5.52 miles. (C.P.T.Exh. 11)

C. Bus route 20, Trip 2, which in 1969–1970 carried students residing in the Aero Vista area just east of Luke Road and south of Fred Wilson Road to Burgess High School. The appropriate point for measuring the distance from this area to Burgess and Austin High Schools is the intersection of Luke Road and Fred Wilson Road. The results are the same as in Finding 55B. (C.P.T.Exh. 11)

56. The Defendant School District, contrary to Plaintiffs' allegations, had no viable input into siting decisions for streets, highways and public and private housing in El Paso. Information regarding location of such projects was unavailable to the Defendant School District until construction plans were finalized. (Testimony J. Cunningham, H. L. Schieman and J. M. Whitaker. The location of housing developments is initially approved by the El Paso City Subdivision Control Committee whose members, various local government agencies, discuss the effect of proposed developments on their agencies and determine whether or not a proposal must be altered or changed. Upon approval by the committee, the recommendations and the subdivision map must be approved by the City Planning Commission whose members are appointed by the Mayor and City Council. Mr. Jonathan Cunningham, Director of El Paso Department of Planning and Research, stated that the EPISD is regularly invited to attend these meetings, but that it has no influence on the location of subdivisions in El Paso. Mr. Schieman also testified that the Defendant School District has no ability to change the location of a subdivision in the city. See also deposition, H. E. Charles)

## PERSONNEL PRACTICES

57. On August 15, 1972, (D.Exh. F–19), the Defendant School District and HEW entered into an agreed plan to remedy deficiencies found by HEW in the following areas: Special Education, Teacher Reassignment and Recruitment of Minority Faculty and Administrators, and Curriculum, with emphasis on the bilingual-bicultural program of the Defendant School District. The Defendant School District has faithfully and diligently pursued, and is pursuing, the implementation of its agreement with HEW in the aforementioned areas, resulting in a finding by the U.S. Commission on Civil Rights that the Defendant School District is in compliance with Title VI of the Civil Rights Act. (D.Exh.G, pp. 65, 78; testimony, J. M. Whitaker, K. Allen Johnson)

58. Following the HEW agreement in 1972 (D.Exh. F–19), the Defendant School District decided on the figure of 34% as the *Singleton* Tolerance Maximum Percentage of Spanish-surnamed teachers to be assigned to any one individual campus for the academic year 1972–1973. Transfers of Anglo and Mexican-American teachers were made to effect this goal. (Testimony, Dr. Fields, P.Exh. 479–G; testimony, E. Russell)

59. In the 1972 HEW agreement the Defendant School District established a goal of attaining a racially balanced teaching staff by September 1977. The Defendant School District announced a desire to hire 160 minority teachers annually over the five-year period commencing September 1972, allowing a variance of 5% to 10%. (D.Exh. F–19, p. 28)

60. The Defendant School District has intensified its hiring of minority teachers. (D.Exh. W–1; testimony, Elmer Russell)

61. The attrition of Mexican-American faculty and professional staff due to leaves of absence, resignation, retirement and death has contributed to, but is not entirely responsible for, the Defendant School District's inability to meet its hiring goal as mandated by the 1972 HEW agreement and *Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). (Testimony, Elmer Russell)

62. The Defendant School District stated its intention in the 1972 plan to recruit bilingual teachers from universities in Arizona and California. (D.Exh. F–19, p. 28). No evidence was presented at trial that it had done so.

63. In the 1972 Agreement with HEW, the Defendant School District committed itself to the "development of a long-range plan which will offer an equal opportunity to all qualified staff for advancement into all levels of the school system." (D.Exh. F–19, p. 31)

64. Of the 306 promotional positions available during the 1975–1976 school year, 108 or 32% were held by members of minority groups. (D.Exh. W–2)

65. During the school year 1974–1975, minority group members held 29% of the available jobs as assistant principals-teaching. Minority group members held 14% of the available jobs as "other" classroom teachers, 11% of the jobs as librarians and audio-visual staff, and no minority group members held psychological services positions. (P.Exh. 151R, EEO–5 Form for 1974–1975). These percentages do not fall within the acceptable *Singleton* Tolerance Range.

66. During the 1975–1976 school year, minority group members held 27% of available jobs as assistant principals-teaching, 30.6% of jobs as other classroom teachers, and 19.8% of available jobs as librarians and audio-visual staff. No minority group members held jobs in psychological services capacities. (C.P.T.Exh. 20, Elementary-Secondary Staff Information, EEO–5, May 19, 1976) These percentages do not fall within the acceptable *Singleton* Tolerance Range.

67. During the 1974–1975 school year, minority group members held 20% of the available jobs as officials, administrators and managers, 29% of the available jobs as consultants and supervisors of education, and 29% of other available professional staff positions. (P.Exh. 151R, EEO–5 Survey of El Paso Independent School District for 1974–1975)

68. During the 1975–1976 school year, minority group members held 30.9% of available jobs as officials, administrators and managers, 29.8% of available jobs as consultants and supervisors of education, and 27.3% of other available professional staff positions. (C.P.T.Exh. 20, Elementary-Secondary Staff Information, EEO–5, May 19, 1976)

69. In 1975–1976 minority group members held 51.4% of the available jobs as elementary school principals. (C.P.T.Exh. 21, Roster of Schools and Principals for 1975–1976) This percentage is 52.7 for the year 1976–1977. (C.P.T.Exh. 22, Roster of

Principals and Assistant Principals for 1976–1977)

70. In 1975–1976 minority group members held 28.6% of the available jobs as elementary assistant principals. (C.P.T. Exh. 21, *supra*) This percentage in 1976–1977 is 33.3%. (C.P.T.Exh. 22, *supra*)

71. In 1975–1976 minority group members held 20% of the available jobs as elementary-intermediate school principals. (C.P.T.Exh. 21) This percentage is 40% in 1976–1977. (C.P.T.Exh. 22)

72. In 1975–1976 minority group members held 36.4% of available positions as elementary-intermediate school assistant principals. (C.P.T. 21) This percentage is 22.2% in 1976–1977. (C.P.T. 22)

73. In 1975–1976 minority group members held 25% of available jobs as intermediate school principals. (C.P.T.Exh. 21) This percentage is also 25% for the school year 1976–1977. (C.P.T.Exh. 22)

74. In 1975–1976 minority group members held 33.3% of available jobs as intermediate school assistant principals. (C.P.T. 21) This percentage is 25% for the school year 1976–1977. (C.P.T.Exh. 22)

75. For both the years 1975–1976 and 1976–1977 minority group members held 33.3% of the available positions as junior high school principals and assistant principals. (C.P.T.Exh. 21, 22)

76. For both 1975–1976 and 1976–1977 minority group members held 37.5% of the available positions as high school principals. (C.P.T.Exh. 21, 22)

77. For the school year 1975–1976 minority group members held 33.3% of the available positions as high school assistant principals. (C.P.T.Exh. 21) This percentage for the year 1976–1977 is 38.5% (C.P.T. Exh. 22) .

78. Minority group members presently hold 34.5% of available teacher positions within the Defendant School District. (C.P. T.Exh. 1, Ethnic Distribution of Teachers Assigned to Schools, Oct. 2, 1976; testimony, Elmer Russell)

79. Under the standard articulated in *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1217–1218 (5th Cir. 1970), minority group members should comprise 32% to 36% of the faculty of each school of the Defendant School District. The Defendant School District is not in compliance with this *Singleton* range as applied to individual schools within the district.

80. The majority of the individual schools and faculties within the Defendant School District are either under-represented by both Spanish-surnamed students and Spanish-surnamed teachers, or overrepresented by both Spanish-surnamed students and Spanish-surnamed teachers. (C.P.T. Exh. 1, Ethnic Distribution of Teachers Assigned to Schools, Oct. 10, 1975; P.Exh. 505–1, 505–2, 505C, 505F)

81. As of October 2, 1975, 22 schools in the Defendant School System had minority teacher percentages that fell below the *Singleton* tolerance standard. There were 13 school faculties within the tolerance range and the faculties of 27 schools exceeded the *Singleton* Tolerance Range. (C.P.T.Exh. 1, Ethnic Distribution of Teachers Assigned to Schools, Oct. 2, 1975)

82. Of the 22 schools whose faculty ratios fell below the *Singleton* Tolerance Range, 68% or 15 were predominantly Anglo-American schools. Eighty-five percent or 23 of the 27 schools whose faculty ratios exceeded the *Singleton* tolerance were predominantly Mexican-American Schools. (C.P.T.Exh. 1, Ethnic Distribution of Teachers Assigned to Schools, Oct. 10, 1975)

83. As of October 2, 1975, the faculty of Bowie High School, 38% Mexican-American, exceeded the *Singleton* tolerance. Bowie is a predominantly Mexican-American school. The faculty of Jefferson High School, 36% minority, fell within the *Singleton* tolerance range. Jefferson High School is also a predominantly Mexican-American school. The other two predominantly Mexican-American high schools fell below the *Singleton* range: Austin High School, 21%; and El Paso High School, 21%. As of October 2, 1975, the faculty ratios of all four predominantly Anglo-American high schools fell below the *Singleton* tolerance: Andress High

School, 23%; Burgess High School, 24%; Coronado High School, 22%; and Irvin High School, 25%. (C.P.T.Exh. 1, Ethnic Distribution of Teachers Assigned to Schools, Oct. 2, 1975)

84. From 1968 to 1975 the rate at which Spanish-surnamed teachers were assigned to predominantly Mexican-American schools remained relatively constant, even though there was an increase in the percentage of Spanish-surnamed teachers hired during those years. (P.Exh. 505–3, 505–4)

85. A bilingual program is operational in 45 elementary schools within the Defendant School District. Twenty-eight or 62% are predominantly Mexican-American schools, while 17 or 38% are predominantly Anglo-American schools. There are 431 teachers assigned to the bilingual program in these schools, of whom 215 or approximately 50% are of Mexican-American extraction, while 199 or 44% are Anglo-American. Six percent of the teachers are of another minority group. (C.P.T.Exh. 2, Bilingual Ethnic Breakdown of Teachers Assigned to Bilingual Program, prepared by Beth Garcia of the EPISD Personnel Dept., May 13, 1976)

## CURRICULA AND OTHER MATTERS

86. The curricula provided by the Defendant School District includes 600 academic subjects and approximately 300 vocational subjects at the high school level. The courses span all branches of academic ability and subject matter diversity. (D.Exh. Q–1 through Q–17, a sampling of courses offered at the high school level relating to ethnic minorities)

87. A technical center, recently opened, houses all of the Defendant School District's vocational programs. The EPISD is accredited by the Southern Association of Colleges and Schools, which recognized in 1972 that the EPISD high school curricula was the most comprehensive in the State of Texas. (Testimony, K. Allen Johnson)

88. The same publication of course offerings is sent to every school within the school system. A minimum enrollment of approximately 20 students is generally required before a course can be offered. If a particular course is requested by the requisite number of students, a teacher will be supplied, even if that teacher teaches less than half a day. The only constraint on a course offering is the lack of a particular facility. (*Id.*)

89. In 1972, the Defendant School District decentralized its staff development and instructional support personnel into three administrative cadres within the school district. Each area is headed by an associate superintendent and each staff consists of a specialized group of instructional support personnel. These people can respond quickly to problems within their respective geographical areas. Staff development programs in the EPISD are an ongoing process, with between 25 and 40 teachers utilizing the staff development center three days a week (during the 1974–1975 school year). Curriculum development takes place prior to staff development and the district strives for a one-year lead time between the training of teachers and the initiation of a new curriculum. (Testimony, K. Allen Johnson)

90. The Defendant School District has instituted, implemented and carried forward a bilingual (Spanish-English) program so that children who may be linguistically disadvantaged in the English language will have equal educational opportunity with all other students. (D.Exh. F–1 to F–57, G, H, H–G–1 to H–G–16, H–I–1 to H–I–37, H–S–1 to H–S–34, H–P–1, I–1 to I–32, Q–1 to Q–17, R–1 to R–5, S, T–1 to T–13, U–1 to U–5, and V–1 to V–4; testimony, K. Allen Johnson, Hibbard Polk, Vera Zlabovsky, Dr. Marguerite Smith Davis)

91. The bilingual program is now operational in 45 schools: kindergarten through third grade in 15 schools; kindergarten through second grade in 15 schools; and kindergarten through first grade in 15 schools. One additional grade will be added to the program each year. Funds to administer the bilingual program come from the Texas Education Agency and the School District's own budget. Students are grouped according to their dominant language and taught by teams of bilingual and monolingual teachers in such a manner that

each student receives subject matter instruction in his own language. The Defendant School District has utilized available federal funds for training programs to increase the number of bilingual teachers. The teachers train for the program one year prior to their participation in it. Approximately 100 monolingual English-speaking teachers have participated in 100 "contact hours" of Spanish language training. Other teachers have continued into the second 100 hours and others are in their third 100–hour series of instruction. The Defendant School District utilizes federal funds from the Emergency Education Act for staff development to train more bilingual teachers. (D.Exh. F–1 to F–57; D.Exh. G, at 18, 64, 65, 71, 74, 78, 79, 81, 83; D.Exh. H; D.Exh. H–G–1 to H–G–16; D.Exh. H–I–1 to H–I–37; D.Exh. H–S–1 to H–S–34, D.Exh. H–P–1; D.Exh. I–1 to I–32; D.Exh. Q–1 to Q–17; D.Exh. R–1 to R–5; D.Exh. S; D.Exh. T–1 to T–13; D.Exh. U–1 to U–5; D.Exh. V–1 to V–4, testimony, K. Allen Johnson, Hibbard Polk, Vera Zlabovsky and Dr. Marguerite Smith Davis, K. Allen Johnson)

92. The Defendant School District has developed its own experts and consultants in individualized instruction. These experts support the teaching staff and have received state and national recognition and have conducted lectures, seminars, and workshops within the State of Texas and nationwide. (Testimony, K. Allen Johnson)

93. Since 1972 the Defendant School District has instituted outstanding cultural and educational programs and practices that especially benefit Mexican-American and other minority ethnic groups, and is regularly augmenting such programs. These programs have served as models throughout the United States and have received international recognition. (D.Exh. F–1 to F–57, G, H, H–G–1 to H–G–16, H–I–1 to H–I–37, H–S–1 to H–S–34, H–P–1, I–1 to I–32, Q–1 to Q–17, R–1 to R–5, S, T–1 to T–13, U–1 to U–5 and V–1 to V–4, Testimony, K. Allen Johnson)

94. The Defendant School District has, for a number of years, operated a variety of federally supported educational programs, the majority of which programs benefit Mexican-American students. (D.Exh. H–G–1 through H–G–16; D.Exh. B, Federally-supported Programs in El Paso Public Schools as of December 5, 1975; Testimony, K. Allen Johnson, J. M. Whitaker)

95. Since August 15, 1972, the Defendant School District has not assigned Mexican-American students to classes for the mentally retarded in disproportionate numbers by reason of language deficiency alone. (D.Exh. A, H–S–3, A–S–25, X, F–19; testimony, Dr. Joseph Ptasnik; see Appendix I for a full description of the School District's "Plan A", the program for students with special learning problems)

96. The achievement test scores of some predominantly non-English speaking students are lower than those of predominantly English speaking students. This is due partially to the verbal orientation of standardized testing techniques, and is not an indication of discriminatory intent on the part of the Defendant School System. (Testimony, Bill Sybert; Cross-Examination, K. Allen Johnson, by Atty. Avila)

97. The Defendant School District participates in a number of federally-funded programs that benefit Mexican-American students. The School District received $2,599,663 in 1975, authorized under Title I of the Elementary and Secondary Education Act of 1965. These funds were spent to provide instructional and supportive services to educationally deprived children in schools with the greatest concentration of children from low income families. The 21 schools that received Title I funds are situated in various parts of the city: Schuster in the northeast; Roberts in the northwest; Clardy and Cooley in the southeast; and other schools in the central area of the city. Nine different programs are offered in these schools. (Testimony, K. Allen Johnson; D. Trial Exh. B, Federally Supported Programs operational in El Paso Public Schools, Dec. 5, 1975.)

98. The programs utilized by the Defendant School District Under Title I of the Elementary and Secondary Education Act of 1965 are as follows:

 a. Upgrowth Program [UP], Supplementary reading in English classes for

students in Grades 1–3. Fifty-three teachers serve in the program.

b. Intensive Language Development [ILD], Classes in oral English for non-English speaking students or students of limited English-speaking ability in Grades 1–8. Thirty-nine teachers serve in the program.

c. Remedial Reading Laboratories [RRL], Supplementary Reading in English classes for students in Grades 4–8. Forty-six teachers serve in the program.

d. Tutorial Mathematics [TM], Supplementary classes in mathematics for students in Grades 4–8. Twenty-two teachers serve in the program.

e. Language arts, typing, strengthening of spelling, vocabulary and the language arts skills while learning the mechanics of typing.

f. Counseling help for children, teachers and parents on a group or one-to-one basis. Sixteen counselors serve in the program.

g. Nurses, providing health services to all Title I children and the provision of medical assistance to those children whose families cannot afford treatment. Five nurses serve in the program.

h. Home-school-community agents, parents within a school attendance area who provide an open line of communication between the school and community. Five home-school-community agents serve in the program.

i. Field studies, the strengthening of language skills by broadening each child's experiences through opportunities to visit sites of interest and historical value in the El Paso area. One field studies manager and 5 teacher-aides serve in the program.

(D. Trial Exh. B, Dr. Hibbard Polk testified that some 240 teachers in classrooms are involved in Title I Programs.)

## FACILITIES

99. Historically, the El Paso School System intentionally maintained inferior facilities for Mexican-American students. This discriminatory policy, abandoned in 1961, was in part effected in the following particulars:

A. The limited funding of Mexican schools. (D.Exh. A–5, "Old-time Principal Taught 150, Gave Medicine, Aided Poor", by G. P. Putnam).

B. Poor building maintenance. (P.Exh. 188–B, Board of Education entry, Aug. 31, 1910).

C. Overcrowded school building facilities. (P.Exh. 154, A Survey of City Schools of El Paso, Texas, by Paul W. Horne, 1922, pp. 20–21)

D. Maintaining overcrowded conditions in the Mexican-American schools. (P.Exh. 305, p. 30; P.Exh. 155, The Borrett Report, Nov. 19, 1934; Testimony, Eduardo Rodriguez)

E. Maintaining inadequate playground and sports facilities. (Testimony, Mr. Moreno)

F. Maintaining poor lighting conditions in the Mexican-American schools. (P.Exh. 188B, School Board entry, Aug. 29, 1950)

G. Permitting significant physical deterioration of plant facilities at predominantly Mexican–American Schools. (P.Exh. 305, Historical Sketches of Aoy School by Bertha Archer Schaer, p. 20; P.Exh. 348–2, Report A. V. Benner, Engineer, dated Jan. 19, 1960; Testimony, Mrs. Josefina Sanchez)

H. Constructing the Newman Elementary School in a predominantly Anglo-American area instead of correcting the deteriorating conditions set forth in the Benner Report, *supra*. (P.Exh. 153–C, dated Feb. 16, 1960; D.Exh. B–2, The Independent School District of the City of El Paso, Texas, Estimated Budget for 1960–1961 Fiscal year, p. 6, No. 8; D.Exh. B–3, The Independent School District of the City of El Paso, Texas, Estimated Budget for the 1961–1962 Fiscal Year, p. 1, indicating the carryover from the prior year, 1960–1961)

100. Since 1955 the Defendant School District has spent in excess of $29,000,000 for construction, renovation, and additions

to the approximately 35 schools that are predominantly Mexican-American in student composition. (D.Exh. D). During the same period in excess of $26,000,000 has been expended on the 24 predominantly Anglo-American schools within the District. (*Id.*)

101. The Defendant School District has spent $229,597.55 on maintenance of 20 predominantly Mexican-American school facilities from 1968 through July 30, 1975. (D.Exh.C)

102. The fact that an older building has been renovated and modernized to meet the physical requirements of educational programs is not an indication of discriminatory intent on the part of the Defendant School District. (Testimony, H. L. Schieman)

103. The fact that a building is new or relatively new does not mean that it necessarily contains better teaching facilities than a renovated building. (Testimony, H. L. Schieman)

104. Since 1961–1962 the Defendant School District has neither constructed new facilities nor renovated existing ones in a discriminatory manner with the exception hereinafter noted.

105. Presently, the assembly areas and administrative areas of all the schools in the El Paso Independent School District are at least partially air conditioned: eight predominantly Anglo-American schools are completely air conditioned, while only 3 predominantly Mexican-American schools are completely air conditioned. (Testimony, H. L. Schieman) This is an indication of discriminatory intent on the part of the Defendant School District toward Mexican-American students.

106. The fact that a strong correlation exists between the greater age of a school and the larger percentage of Spanish-surnamed students enrolled in that school is not an indication of intent on the part of the Defendant to maintain a dual school system. (E.Exh.C, D; testimony, H. L. Schieman)

107. The comparison of student density and the percentage of Spanish-surnamed students, as set forth in the years 1969– 1970 and 1974–1975 (P.Exh. 511A–D) is not relevant to the issue of equal educational opportunity.

108. The four predominantly Mexican-American high schools were not consistently more crowded than the four predominantly Anglo-American high schools during 1969–1975, as alleged in P. Exh. 512. (Testimony, Hibbard Polk, refuting the "under-utilization theory" of Dr. Fields; testimony, Carlos Vela, Hibbard Polk, concerning use of portable classroom buildings by Defendant School District; cross-examination, Dr. Fields, by Atty. Sims, concerning removal of portable classroom buildings from Jefferson High School)

## CONCLUSIONS OF LAW

1. The Court has jurisdiction to hear this action under the Fourteenth Amendment to the United States Constitution, 28 U.S.C. § 1343(3) and (4), and 42 U.S.C. § 1981, § 1983, § 1988, and § 2000d.

2. This action is properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure as the specific requirements of Rule 23(a), Rule 23(b)(1)(B), and Rule 23(b)(2) have been met. *Keyes v. School District No. 1*, 413 U.S. 189, 197, 93 S.Ct. 2686, 37 L.Ed.2d 548, 556 (1973); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *U. S. v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972) (*en banc*); *Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142 (5th Cir. 1972) (*en banc*); and *Alvarado v. El Paso Independent School District*, 445 F.2d 1011 (5th Cir. 1971).

3. The constitutional violations detailed *infra*, in Conclusions of Law 4 through 10, constitute a *prima facie* case tending to show intentional discrimination against Mexican-American students in a significant portion of the El Paso Independent School District.

4. The gerrymandering of the attendance zones of Roberts Elementary School, Dowell and Schuster Elementary Schools, and Travis and Bliss Elementary Schools, by the Defendant School District had segregative consequences. Additionally, the De-

fendant School District's use of the west boundary line of Fort Bliss as the attendance zone line between Austin High School and Burgess High School had the effect of isolating Anglo-American and Mexican-American students.

5. The construction of the new Bowie High School and the Roberts Elementary School at their present sites had segregative consequences. *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *U. S. v. Texas Education Agency*, 532 F.2d 380 (5th Cir. 1976).

6. The transportation of students on bus routes 3, 8, 9, 16, 17 and 20 had segregative consequences.

7. The disparity between the number of predominantly Anglo-American schools and the number of predominantly Mexican-American schools that are completely air conditioned manifests segregative intent on the part of the Defendant School District.

8. The School District's failure to hire additional Mexican-American faculty and teaching staff as agreed in the 1975 HEW Agreement and as mandated by *Davis v. Board of School Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), is an intentionally segregative act.

9. The failure of the Defendant School District to promote Mexican-American personnel to upper level administrative and management positions evidences segregative design on the part of the Defendant School District.

10. The failure of the Defendant School District to assign Anglo-American teachers to predominantly Mexican-American schools and Mexican-American teachers to predominantly Anglo-American schools can only be viewed as an intentional segregative act. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1970).

11. With the exception of those specific areas listed *supra*, in Conclusions of Law 4 through 10, the racial imbalance that exists in other schools of the Defendant School District is not the result of any intentional act of the Defendant School District. Rather, that level of ethnic isolation presently existing within the El Paso Independent School District is the result of the unique geographic and demographic characteristics of the El Paso area.

12. As to all other allegations, Plaintiffs have failed to sustain their burden of proof that the Defendant School District has and is maintaining a dual school system in violation of the Plaintiffs' rights to equal educational opportunity as guaranteed by the Fourteenth Amendment to the United States Constitution.

## MEMORANDUM OPINION AND ORDER

This class action was initiated in 1970 by fourteen plaintiffs, as parents, on behalf of themselves and their children, and all other children and parents in the El Paso Independent School District, alleging that Defendants, acting under color of law, operate and maintain a dual and racially segregated school system in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1981, § 1983 and § 1988. The suit was dismissed on jurisdictional grounds by the United States District Court on March 8, 1971, *Alvarado v. El Paso Independent School District*, 326 F.Supp. 674 (W.D.Tex.1971). The case was reversed and remanded with directions on June 6, 1971, by the United States Court of Appeals for the Fifth Circuit. *Alvarado v. EPISD*, 445 F.2d 1011 (5th Cir. 1971) (*reh. denied*), July 14, 1971. By order of this Court, this case was set for trial on August 18, 1975, but was then continued to December 8, 1975, for non-jury trial on the merits.

This suit is properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure as the specific requisites of Rule 23(a), Rule 23(b)(1)(B), and Rule 23(b)(2) have been met. *Keyes v. School District No. 1*, 413 U.S. 189, 197, 93 S.Ct. 2686, 37 L.Ed.2d 548, 556 (1973); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *U. S. v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972) (*en banc*); and *Alvarado v. El Paso Indepen-*

*dent School District,* 445 F.2d 1011 (5th Cir. 1971). Jurisdiction lies under the Fourteenth Amendment to the United States Constitution, 28 U.S.C. § 1343(3) and (4), 42 U.S.C. § 1981, § 1983, § 1988 and § 2000d. Concurrent with the filing of this opinion, the Court has this day filed its Findings of Fact and Conclusions of Law and a remedial Order. Extensive references to the Findings of Fact will be made throughout this opinion.

The parties have agreed that the issues herein are as follows:

(a) Whether, by means of a variety of acts and/or omissions, including the use of discriminatory zoning lines, discriminatory feeder patterns, the operation of optional zones, racially inspired construction site selection, the use of portable classrooms, the use of liberal transfer policies and discriminatory transfer policies, the El Paso Independent School District has created and maintained a dual school system for Anglo-Americans and Mexican-Americans and other minorities;

(b) Whether, through a variety of acts and/or omissions, including discriminatory treatment of Mexican-American teachers at Mexican-American schools, historical policies against the hiring of Chicano teachers, discriminatory teacher assignment, discriminatory teacher advancement and discriminatory teacher transfers, the El Paso Independent School District has created and maintained racially identifiable schools and has deprived Mexican-American children of positive role models and in so doing the above has furthered the creation of a dual school system for Mexican-American and Anglo-American students;

(c) Whether the El Paso Independent School District has historically maintained a different and inferior curriculum at predominantly Mexican-American schools and for Mexican-American students, resulting in the creation and maintenance of identifi-able, inferior minority schools and classes, and contributing to the creation and maintenance of a dual school system for Mexican-American and Anglo-American students;

(d) Whether the El Paso Independent School District has historically provided inferior facilities at predominantly Mexican-American schools, thereby creating and maintaining identifiable, inferior minority schools contributing to the creation and maintenance of a dual school system for Mexican-American and Anglo-American students;

(e) Whether the El Paso Independent School District has historically assigned Mexican-American students to classes for the mentally retarded in disproportionate numbers and as a result has effectively denied equal educational opportunity to Mexican-American students;

(f) Whether, through a variety of acts and/or omissions in the areas of public zoning and highway placement, racial and exclusionary restrictive covenants, segregatory family relocations, and segregatory public housing construction site selection, the El Paso Independent School District has either directly participated in segregatory decisions resulting in segregated housing in El Paso or has, through the drawing of school attendance zones and school construction, maximized residential segregation and has thereby created and maintained a dual school system for Mexican-Americans and Anglo-Americans;

(g) Whether the El Paso Independent School District has historically maintained separate athletic districts for Mexican-American students and Anglo-American students, thereby creating and maintaining identifiable Mexican-American schools, and as a result has contributed to the creation and maintenance of a dual school system for Mexican-American and Anglo-American students;

(h) Whether Mexican-American students in segregated Mexican-American schools have lower achievement test scores and are more likely to drop out of school, be retained, suspended or expelled than are Anglo-American students as a result of the creation and maintenance of a dual school system by Defendants;

(i) Whether the El Paso Independent School District has historically failed to utilize bilingual communications with the parents of Mexican-American students and has thereby denied equal educational opportunity to Mexican-American students.

## PHYSICAL SETTING

As of the 1973–1974 school year, the El Paso Independent School District consisted of 35 elementary schools, 12 elementary-intermediate schools, 3 intermediate schools, 1 junior high school and 8 high schools, serving approximately 62,000 students. The School District is split by a mountain into a "U" shape and is bordered by the Ysleta Independent School District to the southeast, the Canutillo Independent School District to the northwest, the State of New Mexico to the west, the Rio Grande River and the Republic of Mexico to the south, and Fort Bliss, a large military reservation, to the north and east. Mt. Franklin rises to an elevation of over 7,000 feet above sea level, while downtown El Paso is less than 4,000 feet above sea level. The useable area between the southern foothills of Mt. Franklin and the Rio Grande affords a space 1.6 miles wide through the pass in the mountain range, east and west. The Franklin Canal, the Chamizal Highway, Interstate Highway 10, Paisano Drive, and other arterial streets and highways are all located within this narrow neck between the mountain and the International Boundary with Mexico. Also located in this pass are the railroad tracks and yards of the Southern Pacific Railway, Santa Fe Railway, Texas & Pacific Railway, and two Mexican railways which approach El Paso from the south.

Ciudad Juarez, a major metropolitan area with an estimated population of 498,058 in 1976, is located directly across the Rio Grande from El Paso. The District of Juarez, in the northwest part of the State of Chihuahua, contained 1.7 million people as of 1970 in a 94,831 square mile area encompassing the cities of Chihuahua, Felicias, Hidalgo de Parral and Juarez. El Paso's proximity to Ciudad Juarez and the constant flow of Mexican people from that city into El Paso have contributed to the unique problems faced by the Defendant School District.[1]

In determining whether, as alleged by Plaintiffs, the El Paso Independent School District historically has maintained and is maintaining a dual school system for Anglo-American and Mexican-American students, this Court is guided principally by the teachings of the United States Supreme Court in *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) [hereinafter *Keyes*], and *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) [hereinafter *Swann*]. Further guidance is provided by *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) [hereinafter *Green*] and

1. The facts of geography and immigration distinguish the case at bar from the Corpus Christi Independent School case, *Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142 (5th Cir.1972). The Corpus Christi School District is crescent-shaped, extending approximately 11 miles in length from southeast to northwest, and varies in width from 3 to 4 miles. The district follows the curvatures of the Corpus Christi and Nueces Bays and is bounded by water on the northeast and south. *Id.* at 467 F.2d 145. The unique geographical and demographic features of the El Paso Independent School District serve also to distinguish the case at bar from the many inland school districts in Texas: Midland, *U. S. v. Midland Independent School District*, 519 F.2d 60 (5th Cir.1975); Uvalde, *Morales v. Shannon*, 516 F.2d 411 (5th Cir. 1975); Waco, *Arvizu v. Waco Independent School District*, 495 F.2d 499 (5th Cir.1974); New Braunfels, *Zamora v. New Braunfels Independent School District*, 519 F.2d 1084 (5th Cir.1975); and Austin, *U.S. v. Texas Education Agency*, 467 F.2d 848 (5th Cir.1972) and *U.S. (Dedra Estelle Overton et al.) v. Texas Education Agency et al.*, (Austin Independent School District) 532 F.2d 380 (5th Cir.1976).

*Austin Independent School District v. United States,* —— U.S. ——, 97 S.Ct. 517, 50 L.Ed.2d 603 (Dec. 6, 1976) (Mr. Justice Powell concurring) [hereinafter *Austin II*].

 Where, as in El Paso, no statutory dual school system has ever existed as to Plaintiffs' ethnic group, Plaintiffs have the burden of proving that a segregated school system exists and that such segregation was brought about and maintained by intentional state action. *Keyes, supra* at 413 U.S. 207–209, 93 S.Ct. 2686, 37 L.Ed.2d 562–563. "Intent" as used in the context of a school desegregation action must be equated with a racially discriminatory purpose. Further, there must be a causal relationship between the acts complained of and any racial imbalance existing in the suspect school system. *Id.* See also *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597, 607–608 (1976). It is important to note that for purposes of a school desegregation action, the Court's inquiry must be limited to the segregative acts or omissions of school authorities only, and may not be concerned with segregation that might be the result of other types of state action. *Swann,* 402 U.S. 1, 22–23, 91 S.Ct. 1267, 28 L.Ed.2d 554, 570 (1971).[2] At the threshold, a finding of intentionally segregative school board actions in a meaningful portion of the school system establishes a *prima facie* case of unlawful segregative design on the part of school authorities and thereafter shifts to them the burden of proving that other segregated schools within the school system are not also the result of intentionally segregative actions. *Keyes, supra,* 413 U.S. at 208, 93 S.Ct. 2686, 38 L.Ed.2d at 563.

## PLAINTIFFS' PRIMA FACIE CASE

In their attempt to prove duality in a significant portion of the school district, Plaintiffs have alleged that the Defendant School District has assured the assignment of Mexican-American students to ethnically identifiable schools through use of the following techniques:

1. Racially-inspired selection of school construction sites;

2. Discriminatory zoning lines; and

3. Discriminatory feeder patterns.

 The building of a school to a certain size and in a certain location "with conscious knowledge that it would be a segregated school" is an indicator of discriminatory intent on the part of a school district. *Keyes, supra* 413 U.S. at 201–202, 93 S.Ct. at 2694, 37 L.Ed.2d at 559.[3] Plaintiffs have

2. "We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious or ethnic grounds. The target of the cases from Brown I (*Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 [1954]) to the present was the dual school system . . . It would not serve the important objective of *Brown I* to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination. We do not reach in this case the question whether a showing that school desegregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree . . . Our objective in dealing with the issues presented by these cases is to see that school authorities exclude no pupil of a racial minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools." *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 22–23, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554, 570 (1971).

3. The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. School authorities must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this consideration will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far-reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods. In the past, choices in this respect have been used as a potent weapon for creating

proven that within the El Paso Independent School District the construction of Roberts Elementary School in 1961 and the new Bowie High School in 1973 fall into this category.

The 1960 census for the City of El Paso indicates that the area immediately surrounding the Roberts Elementary School, 341 Thorne Avenue in northwest El Paso, was 66% to 85% Mexican-American in population.[4] The Defendant School District therefore knew or had reason to know that Roberts Elementary School would be a predominantly Mexican-American school when it opened. Similarly, the 1970 census indicates that the residential areas contiguous to the site selected for the construction of the new Bowie High School in 1973 at 801 San Marcial Street in south El Paso were 90% to 100% Mexican-American in population.[5] The School District could not be ignorant of this fact. The site selected for the new Bowie High School and its present attendance zone assure that it will remain a predominantly Mexican-American school.

Plaintiffs have further alleged and attempted to adduce proof at trial that the site selection and construction of the following schools manifested a segregative design on the part of the Defendant School District: Canyon Hills Intermediate School, Burnet Elementary School, Logan Heights Elementary School, Burgess High School, H. E. Charles Elementary School, Carlos Rivera Elementary School, L. B. Johnson Elementary School, Crosby Elementary School, Bassett Elementary School, Stanton Elementary School, Irvin High School, Andress High School, Coronado High School, and MacArthur Elementary School. As set out in findings 42 through 53 of the Findings of Fact filed concurrent herewith, this Court does not believe that the siting and construction of the above-listed schools evidences any segregative design on the part of the Defendant School District.[6]

---

or maintaining a state-segregated school system. *Swann*, 402 U.S. at 20–21, 91 S.Ct. 1267, 28 L.Ed.2d at 569.

4. P.Exh.Map 70, El Paso Census, Percentage of Spanish-surnamed residents, 1960.

5. D.Exh.Map P, Map showing School Boundaries as of June 4, 1975, with overlay to Department of Planning and Research Census Tract Map.

6. In conjunction with their allegations of discrimination in the areas of school siting and construction, Plaintiffs also press the theory that the Defendant School District fostered segregation by under-utilizing available classroom space. Dr. Fields, Plaintiffs' expert witness, testified that the construction of many schools in the El Paso Independent School District was unnecessary because of the number of available spaces in nearby schools: (1) the addition to Wainwright Elementary School in 1956, when 776 empty spaces were available in nearby schools including Burnet Elementary, Rusk Elementary, Crockett Elementary-Intermediate, Coldwell Elementary-Intermediate, Hillside Elementary, and Houston Elementary-Intermediate; (2) the construction of Burnet Elementary School in 1953, when 248 spaces were available in nearby Bassett Elementary-Intermediate School; (3) the addition to Burnet Elementary School in 1965, when 64 spaces were available within this cluster of schools; (4) the addition to Coldwell Elementary-Intermediate School in 1964, when 333 spaces were available in the cluster of schools consisting of Coldwell, Hawkins, Hillside, and Milam Elementary Schools; (6) the addition to Hawkins Elementary School in 1965, when 436 seats were available in the surrounding cluster; (7) an addition to Ross Junior High School, when 1460 seats were available in Bassett Elementary-Intermediate, Travis Elementary, Burnet Elementary, Rusk Elementary, Coldwell Elementary-Intermediate, Hillside Elementary, and Hughey Elementary Schools; (8) the opening of Bassett Elementary-Intermediate School in 1957, when 104 seats were available in nearby schools; (9) the alleged under-utilization of Magoffin Elementary School as a result of the addition of cottages to that campus in 1958 and the construction of Crosby Elementary-Intermediate School in the same year; (10) the construction of Stanton Elementary School in 1959, which resulted in under-utilization of 756 available spaces at Magoffin Elementary-Intermediate School; and (11) the construction of MacArthur Elementary-Intermediate School in 1965, coupled with a 20-room addition to the Burgess High School, which resulted in the under-utilization of 562 available spaces at Burgess High School. Dr. Fields testified that in his opinion the construction of Canyon Hills Intermediate School in 1972 and the addition to Henderson Intermediate School in 1975 were unnecessary. Dr. Fields further testified that Dowell Elementary School and Terrace Hills Elementary-Intermediate Schools were both under-utilized for several years. Dr. Fields concluded that approximately 15,660 unneeded seats had been constructed in the Defendant School District over the past years, including approximately 6,000 available seats in portable classroom structures.

▮ Plaintiffs have alleged and adduced proof at trial that the Defendant School District has in part pursued a policy of drawing school attendance zones to include or isolate students of one ethnic group while maintaining concentrations of students of another ethnic group at adjacent schools. This particular kind of action may be considered another indication of discriminatory intent, *Keyes, supra* 413 U.S. at 201, 93 S.Ct. 2686, 37 L.Ed.2d at 559, and the Court finds that discriminatory intent on the part of the Defendant School District is indeed evident in the drawing of the attendance zones of the following schools: Roberts Elementary School; Dowell Ele-

The Court feels that Dr. Fields' conclusions are subject to serious questioning. Dr. Fields testified that although he visited several schools, he did not actually make any onsite inspections of schools. He did not speak with any teaching or administrative personnel of the Defendant School District. He testified that he consulted no exhibits more recent than 1974 and stated that up-to-date information was unavailable because discovery in the case had closed. Dr. Fields used the number 30 to compute the number of seats per classroom for elementary school classes and the number 25 for secondary school classes. He testified that he did not consider variables in programming which might result in a lower number of students per room. He further stated his opinion that the number of special education programs administered by school facilities does not usually create a difference in the level of classroom utilization.

Dr. Fields' method for computing the capacity of school facilities was strongly disputed by Dr. Hibbard Polk, Associate Superintendent for Administration of the El Paso Independent School District. Dr. Polk's responsibilities include the assessment of facilities needs for the Defendant School District. Dr. Polk stated that in his experience he had never heard of Dr. Fields' method of ascertaining school capacity. He did not believe Dr. Fields' statement to the effect that there are 15,660 unutilized seats in the El Paso Independent School District to be a valid statement. Dr. Polk stated that the El Paso Independent School District sponsors many programs on both high school and elementary school campuses which involve less than 25 or 30 students per class. Five to ten students per class is the average in such programs as upgrowth, intensive language development and remedial reading. These individualized programs use sophisticated equipment and need specialized classroom space. Also, Dr. Polk pointed out that each campus has at least one resource room and may have two. These resource rooms usually house fewer than 25 children for special classes. Facilities must be provided for other specialized programs and individualized work, including band, orchestra, chorus, speech pathologist, emotional development of handicapped children, and various schools for the deaf. Dr. Polk also noted that certain high school campuses housed programs that do not require 25 to 30 students per class: vocational programs, homemaking, shop, and many science labs.

Dr. Polk stated in his testimony that at the present time 243 teachers are employed by the El Paso Independent School District to teach programs such as remedial reading, upgrowth, language development and special math courses. Each teacher utilizes a separate room for teaching and equipment storage. There are but 5 to 10 students per period in each room, a figure significantly below Dr. Fields' base figure for classroom utilization. Also, each resource teacher under the School System's special education Plan A requires a separate room for teaching and storage of sophisticated equipment and materials. There are 110 resource teachers in the district and resource classes contain between 5 and 10 students per period. Recognizing that the use of classroom space for special education programs may reduce the total number of available classroom spaces on a systemwide basis, the Court does not feel that this kind of space reduction may be equated with the theory of "under-utilization" of classroom space. This conclusion is supported by Dr. Polk's testimony that, in his opinion, there are fewer than 100 empty seats per campus within the El Paso Independent School District.

Dr. Polk also disputed the number of seats that Dr. Fields attributed to the portable classrooms utilized by the District. At the time of trial, the School District was utilizing 155 portable buildings—14 for non-classroom functions and 141 for classroom functions. Dr. Fields estimated that 6,000 seats were available in portable buildings within the El Paso Independent School District, but by Dr. Polk's analysis the additional available seating in portable classrooms amounts to less than 4,200 seats.

It is apparent that had Dr. Fields made an onsite inspection of the various campuses within the district, he would have seen that the capacities of campus classrooms are tailored to the individual instructional needs of a particular campus. Many of Dr. Fields' conclusions concerning the building of unneeded school facilities were based on his analysis of present school facility capacity. Dr. Polk's testimony substantially discredits the validity of Dr. Fields' reasoning. Most of the school construction contested by Dr. Fields was undertaken in 1950's and 1960's to accommodate El Paso's rapidly growing population in the north and northeastern portions of the city. (D.Exh. Map P.)

mentary School and Schuster Elementary School; Travis Elementary School and Bliss Elementary School; and the use of the western boundary of Ft. Bliss as the attendance zone line between Austin High School and Burgess High School.

Prior to construction of Roberts Elementary School, the Putnam Elementary School opened in 1959 at 6508 Fiesta Drive in northwest El Paso.[7] Subsequent to the construction of Roberts Elementary School, two elementary schools and four elementary-intermediate schools were constructed in northwest El Paso: Western Hills Elementary-Intermediate School, 530 Thunderbird Drive, opened in 1963; Morehead Elementary-Intermediate School, 5625 Confetti Drive, opened in 1965; White Elementary-Intermediate School, 4256 Roxbury Drive, opened in 1967; Lincoln Elementary-Intermediate School, 500 Mulberry Avenue, opened in 1971; Carlos Rivera Elementary School, 6445 Escondido, opened in 1975; and L. B. Johnson Elementary School, 499 Cabaret, opened in 1975.[8] Enrollment statistics for these schools dating from 1967 to the present indicate that Roberts Elementary School has maintained a Mexican-American student percentage of approximately 82.5% while the other seven schools have main-

7. The Putnam Elementary School is located at 6508 Fiesta Drive in west El Paso. Its school attendance zone begins at the intersection of Sunland Park Drive and Interstate 10, proceeds north along Interstate 10 to Mesa Street, east and south along Mesa Street to Sunland Park Drive and west along Sunland Park Drive to the point of origin at the intersection of Sunland Park Drive and Interstate 10. (D.Exh. L, Adopted School Board Policy 5170, Fixing Attendance Zones and setting out transfer policies, at 20)

8. a. Lincoln Elementary-Intermediate School is located at 500 Mulberry Avenue in northwest El Paso. Its school attendance zone begins at the intersection of Country Club Road and the New Mexico State Line and proceeds north along the New Mexico State Line to the Canutillo School District, east along the Canutillo School District line to the Santa Fe Railroad, south along the Santa Fe Railroad to Country Club Road, and west on Country Club Road to the point of origin at the New Mexico State Line. (D.Exh. L, *supra* n. 7, at 17)
b. The Morehead Elementary-Intermediate School is located at 5625 Confetti Drive in west El Paso. Its attendance zone begins at the intersection of Sunland Park Drive and Mesa Street and proceeds south on Mesa Street to its intersection with Confetti Drive, east across open country to the Franklin Mountains, south along the Franklin Mountains to a point where the F. W. Brown Survey No. 224 would meet the Franklin Mountains, and then along this line to the point where Stanton Street intersects this line (approximately the entrance of the Camelot Apartment project), south on Stanton Street to the point of its intersection with the El Paso Electric Company easement, and west along the El Paso Electric Company easement to the intersection with Mesa Street, which is just south of Castellano Street. (D.Exh. L, *supra* n. 7, at 19)

c. The Western Hills Elementary School is located at 530 Thunderbird Drive in west El Paso. Its attendance zone begins at a point on Mesa Street west of Fountain Street where the ravine intersects Mesa Street and proceeds east and north up the ravine to Northwind Drive, up Northwind Drive approximately 50 yards to the ravine continuing up the ravine to its intersection with Broadmoor Drive, from this point due north across open country to the Canutillo School District Line, east along the Canutillo School District line to the Franklin Mountains, south along the Franklin Mountains to a point due east of the intersection of Mesa Street and Confetti Drive, west across open country to the intersection of Mesa Street and Confetti Drive, and north and west along Mesa Street to the point of origin. (D.Exh. L, *supra* n. 7 at 24)
d. The White Elementary-Intermediate School is located at 4256 Roxbury Drive in west El Paso. Its attendance zone begins with the intersection of Sunland Park Drive and the New Mexico State Line and proceeds north along this state line to the intersection of Country Club Road, east on Country Club Road to the Santa Fe Railroad, east on Mesa Street from the Santa Fe Railroad to Interstate 10, south on Interstate 10 to Sunland Park Drive and west on Sunland Park Drive to the point of origin at the intersection of Sunland Park Drive and the New Mexico State Line. (D.Exh. L, *supra* n. 7, at 25)
e. The Roberts Elementary School is located at 341 Thorn Avenue in west El Paso. Its attendance zone begins at the intersection of Mesa Street and the Santa Fe Railroad to the Canutillo School District Line, east along the Canutillo District Line to the El Paso Natural Gas Company easement to Mesa Street, and west along Mesa Street to the point of origin at the Santa Fe Railroad at the "Crossroads". (D.Exh. L, *supra,* n. 7, at 21)

tained an average Mexican-American percentage of 22.88%.[9] All of these schools are within a range of between one-third mile and approximately four miles of one anoth-

9. Figures for charts are taken from P.Exh. 151, EPISD Enrollment figures for 1967–1975; D.Exh.Map P. *supra* n. 6; C.P.T.Exh. 31, *supra* n. 8.

Chart 9

| Year | LINCOLN | MOREHEAD | PUTNAM | WESTERN HILLS | WHITE | ROBERTS | JOHNSON | RIVERA |
|---|---|---|---|---|---|---|---|---|
| 1967 | | 24.39%S* .10%O** | 12.51%S* .71%O** | 9.66%S* .79%O** | 20.50%S* | 79.24%S* .47%O** | | |
| 1968 | | 13.13%S 1.03%O | 15.66%S .30%O | 8.81%S .33%O | 21.80%S .20%O | 72.70%S 3.39%O | | |
| 1969 | | 13.95%S .74%O | 15.07%S | 8.56%S | 20.87%S .18%O | 75.81%S 1.62%O | | |
| 1970 | | 15.76%S .64%O | 16.50%S .27%O | 7.40%S | 25.25%S | 85.33%S .58%O | | |
| 1971 | 50.49%S | 30.45%S .52%O | 21.79%S .27%O | 7.78%S | 28.22%S .38%O | 87.11%S 1.03%O | | |
| 1972 | 46.15%S | 29.45%S .48%O | 18.40%S | 7.0%S | 28.16%S | 83.85%S .70%O | | |
| 1973 | 21.54%S .27%O | 37.59%S .91%O | 22.83%S .12%O | 8.2%S | 31.51%S .55%O | 85.78%S .95%O | | |
| 1974 | 20.21%S | 36.49%S .78%O | 20.84%S .93%O | 10.67%S .11%O | 36.22%S .45%O | 86.53%S 1.84%O | 52.00%S .90%O | |
| 1975 | 20.21%S | 36.50%S .79%O | 20.85%S .94%O | 10.67%S .12%O | 36.22%S .45%O | 86.53%S 1.84%O | 50.38%S 4.15%O | 12.16%S .09%O |
| 1976 | | | | | | | | |

* S = Spanish surname

**O – Other Minority Groups

er.[10] The present attendance zones of the six predominantly Anglo-American schools assure that these schools will remain predominantly Anglo-American in ethnic composition, while Roberts Elementary School will contain a large percentage of Mexican-American students.

The school enrollment statistics for the years 1967 to the present indicate that the Dowell Elementary School has contained a minority student percentage of approximately 15%, while Schuster Elementary School has contained an average minority student percentage of 34%.[11] The

10. Testimony, Dr. Fields, C.P.T.Exh. 1, Map of City of El Paso, 1972.

11. Figures for chart are taken from P.Exh. 151H, *supra* n. 9 and D.Exh.Map P, *supra* n. 6.

Chart 11

23.

| | DOWELL ELEMENTARY SCHOOL | SCHUSTER ELEMENTARY SCHOOL |
|---|---|---|
| 1967 | 4.04%S * | 17.53%S * |
| | 5.10%O ** | 1.47%O ** |
| 1968 | 5.10%S * | 19.74%S * |
| | 4.22%O ** | 1.54%O ** |
| 1969 | 5.83%S * | 21.05%S * |
| | 5.83%O ** | 1.65%O ** |
| 1970 | 9.43%S * | 23.05%S * |
| | 4.65%O ** | 4.32%O ** |
| 1971 | 9.45%S * | 24.03%S * |
| | 6.33%O ** | 2.47%O ** |
| 1972 | 10.06%S * | 27.79%S * |
| | 6.07%O ** | 1.99%O ** |
| 1973 | 14.92%S * | 31.13%S * |
| | 5.44%O ** | 3.45%O ** |
| 1974 | 12.63%S * | 57.77%S * |
| | 5.91%O ** | 5.55%O ** |
| 1975 | 12.63%S * | 57.27%S * |
| | 5.94%O ** | 5.55%O ** |
| 1976 | | |

* S = Spanish surname

**O = Other Minority Groups

respective attendance zones of the two schools dictate that Dowell will remain predominantly Anglo-American in student composition, while Schuster Elementary School will become a predominantly Mexican-American School.[12] The Defendant's argument that State Highway 54, Dyer Street, provides a natural barrier between the two school zones because it is dangerous to cross due to its heavy traffic load [13] is not valid in this instance where the two schools are located approximately 1.14 miles apart [14] and contain such disparate proportions of minority group students.

Travis Elementary School, opened in 1922, is located at 5000 N. Stevens Street, and Bliss Elementary School, opened in 1958, is located at 4401 Sheridan Road on the Fort Bliss Military Reservation. The attendance zones of these two north El Paso Schools are adjacent to one another.[15] School enrollment statistics for the years 1967 to the present indicate that Travis Elementary School has contained a minority group student population of 72.49%, while Bliss Elementary School has contained a minority group student population of 32.25%.[16] The attendance zones of the two

12. a. Dowell Elementary School is located at 5249 Bastille Avenue in northeast El Paso. Its attendance zone begins with the intersection of Gschwind Street and the El Paso Electric Company easement between Raintree Avenue and Antonio Avenue, and proceeds east on the El Paso Electric Company easement to Dyer Street, northeast on Dyer Street to Fairbanks Drive, west on Fairbanks Drive to Rushing Drive, south on Rushing Drive to Transmountain Road, west on Transmountain Road to Gschwind Street, and south on Gschwind Street to the point of origin at the El Paso Electric Company easement between Raintree Avenue and Antonio Avenue. (D.Exh. L, *supra* n. 7, at 14).
b. Schuster Elementary School is located at 5515 Will Ruth Avenue in northeast El Paso. Its attendance zone begins at the intersection of McCombs Street and Dyer Street, proceeds south on McCombs Street to Squires Court, west on Squires Court to Albany Place, west again cutting perpendicularly across Waverly, Rutledge, Vicksburg, Roanoke, Raleigh, Fairfax, Charleston and Salisbury Streets to Dyer Street, and north on Dyer Street to the point of origin at McCombs Street. (D.Exh. L, *supra* n. 7, at 22)

13. Testimony of Defendants' witness, Charles Hart, Jr.

14. C.P.T.Exh. 1.

15. a. Travis Elementary School is located at 5000 North Stevens Street in north El Paso.

Its attendance zone begins at the intersection of Harrison Avenue and the north-south freeway, and proceeds along the north-south freeway to Hayes Avenue, west on Hayes Avenue to Dyer Street, north on Dyer Street to Fred Wilson Road, west on Fred Wilson Road to Piedras Street, southwest on Piedras Street to Pierce Avenue, east on Pierce Avenue to Justus Street, south on Justus Street to Harrison Avenue, east on Harrison Avenue to the point of origin at the north-south freeway. (D.Exh. L, *supra* n. 7, at 23; D.Exh.Map P, *supra* n. 6)

b. Bliss Elementary School is located at 4401 Sheridan Road on Fort Bliss in north El Paso. Its attendance zone begins at the intersection of Dyer Street and Fred Wilson Road and continues east on Fred Wilson Road to the north-south freeway, south along the north-south freeway to Haggerty Road, north on Haggerty Road to Work Avenue, east on Work Avenue and continuing across the National Cemetery to Stuart Road, south on Stuart Road to Chaffee Road, west on Chaffee Road to Pleasanton Road, south on Pleasanton Road to Ashburn Street, west on Ashburn Street to Crosby Road, south on Crosby Road to the southern boundary of the Fort Bliss Military Reservation, and northwest along the Fort Bliss southern boundary to Pershing Drive. (D.Exh. L, *supra*, n. 7, at 9; D.Exh.Map P, *supra* note 6)

16. Figures for chart are taken from P.Exh. 151H and D.Exh.Map P, *supra* n. 6.

Chart 16

| | TRAVIS ELEMENTARY SCHOOL | BLISS ELEMENTARY SCHOOL |
| --- | --- | --- |
| 1967 | 52.87%S * | 6.82%S * |
| | 11.30%O ** | 22.78%O ** |
| 1968 | 54.37%S * | 9.52%S * |
| | 9.16%O ** | 19.14%O ** |

schools guarantee that Travis Elementary School will retain a high percentage of minority group students, while the Bliss Elementary School will maintain a high percentage of Anglo-American students.[17] Defendant's argument that the railroad line and the proposed north-south freeway between the two schools provide a natural barrier to children crossing between the two zones is not valid because the Bliss Elementary School attendance zone does in fact extend both across and west of the railroad and across the proposed north-south freeway.[18] Such disparate ethnic composition in schools that are only one mile apart is unjustified.[19]

The school enrollment statistics for the years 1967 to the present indicate that Austin High School, built in 1930 at 3500 Memphis in Central El Paso, contained a minority group percentage of 71.2%, while Bur-

Chart 16

| | TRAVIS ELEMENTARY SCHOOL | BLISS ELEMENTARY SCHOOL |
|---|---|---|
| 1969 | 58.11%S * | 6.98%S * |
| | 9.38%O ** | 32.43%O ** |
| 1970 | 62.03%S * | 8.60%S * |
| | 8.74%O ** | 21.70%O ** |
| 1971 | 66.81%S * | 8.63%S * |
| | 8.45%O ** | 21.15%O ** |
| 1972 | 70.06%S * | 6.63%S * |
| | 8.66%O ** | 25.01%O ** |
| 1973 | 69.86%S * | 9.10%S * |
| | 9.12%O ** | 25.58%O ** |
| 1974 | 66.28%S * | 8.25%S * |
| | 10.45%O ** | 24.35%O ** |
| 1975 | 66.27%S * | 9.25%S * |
| | 10.45%O ** | 24.36%O ** |
| 1976 | | |

* S = Spanish surname

**O - Other Minority Groups

17. Note 15, *supra*; D.Exh.Map P.

18. D.Exh.Map P.

19. C.P.T.Exh. 1.

gess High School, opened in 1955 at 7800 Edgemere Blvd. in east El Paso,[20] contained a minority group percentage of 38.7%.[21] The Fort Bliss Military Reservation is with-

**20.** Def.Response to Plf.Int.Nos. 25a, 25g.

**21.** Figures for chart are taken from P.Exh. 151H and D.Exh.Map P.

Chart 21

| | AUSTIN HIGH SCHOOL | BURGESS HIGH SCHOOL |
|---|---|---|
| 1967 | 55.07%S * | 35.56%S * |
| | 2.64%O ** | 4.10%O ** |
| 1968 | 57.14%S * | 36.04%S * |
| | 2.60%O ** | 4.28%O ** |
| 1969 | 63.38%S * | 33.49%S * |
| | 2.54%O ** | 5.12%O ** |
| 1970 | 65.84%S * | 37.63%S * |
| | 2.65%O ** | 4.84%O ** |
| 1971 | 70.41%S * | 33.24%S * |
| | 3.27*O ** | 4.76%O ** |
| 1972 | 71.44%S * | 34.39%S * |
| | 3.15%O ** | 5.28%O ** |
| 1973 | 76.87%S * | 28.15%S * |
| | 2.22%O ** | 6.27%O ** |
| 1974 | 78.37%S * | 30.14%S * |
| | 2.39%O ** | 7.46%O ** |
| 1975 | 78.37%S * | 30.14%S * |
| | 2.42%O ** | 7.47%O ** |
| 1976 | | |

* S - Spanish surname

**O - Other Minority Groups

in the Burgess High School attendance zone.[22] In 1974–1975, 499 high school students residing on Fort Bliss attended Burgess High School and 29 attended Austin High School, despite the fact their residences on Fort Bliss are between one mile and 3.4 miles closer to Austin High School than to Burgess High School.[23] In 1975–1976, 435 high school students residing on Fort Bliss attended Burgess High School while 24 attended Austin High School.[24] The present attendance zones of the two schools indicate that Austin High School will remain populated by a large percentage of minority group students, while Burgess High School will retain a large percentage of Anglo-American students.[25] The attendance zone lines drawn between Austin High School and Burgess High School preserved the high percentage of minority group students at Austin High School and the high percentage of Anglo-American students at Burgess High School.

In addition to the above-discussed discriminatorily drawn attendance zones, Plaintiffs alleged and proved at trial the maintenance of additional discriminatory attendance zones which had the effect of causing ethnic isolation of Mexican-American and Anglo-American students. These zones, discussed in Findings of Fact 35 through 37 were redrawn by the Defendant School District in 1971 so as to eliminate the discriminatory effects thereof. This Court therefore does not believe that the maintenance of the Jones Elementary School Zone, the Mesa Elementary School Zone, and the establishment of open zones between Burgess High School, Austin High School and Jefferson High School should be considered as present indicia of segregatory intent on the part of the Defendant School District.

The transportation and assignment of students on a racially identifiable basis is another indication of discriminatory intent on the part of a school board. *Keyes, supra,* 413 U.S. at 202, 93 S.Ct. 2686, 37 L.Ed.2d at 559. Plaintiffs have adduced sufficient evidence at trial to support a finding that the El Paso Independent School District's implementation of bus routes Nos. 3, 8, 9, 16, 17, and 20 in 1969–1970 fits this category. Bus route No. 3 transported Anglo-American students residing on Fort Bliss to the Logan Elementary School, a predominantly Anglo-American school, when Burnet Elementary School, a predominantly Mexican-American School,

---

**22.** D.Exh.L, P.

**23.** In 1974–1975, 26.828% or 499 students of the 1,860 students comprising the Burgess High School enrollment lived on Fort Bliss; 100 or approximately 20% of this number were of minority extraction. (C.Exh. 17A, Students Living on Fort Bliss, Burgess High School, 1974–1975). In 1975–1976, 23.224% or 435 students of the Burgess High School enrollment of 1873 lived on Fort Bliss; 98 or approximately 23% of this number were of minority extraction. (C.P.T.Exh. 17B, Students Living on Fort Bliss, Burgess High School, 1975–1976). In 1974–1975, 0.963% or 29 of the 3001 students enrolled at Austin High School lived on Fort Bliss. None of this number were members of a minority group. (C.P.T. 17C, Students Living on Fort Bliss, Austin High School, 1974–1975). In 1975–1976, 0.798% or 24 of the 3006 students enrolled at Austin High School lived on Fort Bliss. Four or 16.67% of this number were members of a minority group. (C.P.T. Exh. 17D, Students Living on Fort Bliss, Austin High School, 1975–1976).

**24.** *Id.*

**25.** Austin High School is located at 3500 Memphis Avenue in north central El Paso. Burgess High School is located at 7800 Edgemere Boulevard in east El Paso. The boundaries of the two schools are as follows:
a. The boundary between El Paso High School and Austin High School is a line beginning at the intersection of Maple Street and Interstate 10, extending northwest on Maple to Arizona, northeast on Arizona Street to Alabama Street, north on Alabama to San Diego, then west on San Diego to the mountain;
b. The boundary between Austin High School and Burgess High School is Raynolds Street;
c. The boundary between Jefferson High School and Burgess High School is a line beginning at the Phelps Dodge Refining Corporation, and extending northwest on Trowbridge to its intersection with Interstate 10, then west on Interstate 10 to the north-south freeway;
d. The boundary between Austin High School and Irvin High School is an extension of Ellerthorpe Street west to the mountain; and
e. The Fort Bliss Military Reservation is in the Burgess High School District. (D.Exh.L, at 1; D.Exh.Map P)

was 0.5 mile closer to the area where the students lived.[26] Bus routes Nos. 8, 9, 16, 17, and 20 transported predominantly Anglo-American students from Fort Bliss and its immediate environs to Burgess High School, although the distance to Austin High School was between 1 and 4.2 miles closer to their residences.[27] Although bus routes Nos. 17 and 20 are no longer used, route Nos. 3, 8, 9 and 16 remain basically unchanged from 1969–1970.[28] This data is comprehensively set out in Findings of Fact Nos. 25 through 30.

In the area of transportation and assignment, the Plaintiffs proved or attempted to adduce evidence tending to prove discriminatory intent with regard to the implementation of additional transportation routes. As set out in Findings of Fact Nos. 32 through 34 the Court believes that any discriminatory effects of such transportation policies have been vitiated by the abandonment of such policies.

 In addition to potential discrimination in the areas of siting and construction of new schools, discussed above, the closing of old schools and the abandonment of schools are proper factors to be weighed in making a determination as to the existence of state-imposed segregation. The Court is bound to closely scrutinize such actions and determine whether or not they are used to foster a dual school system. *Swann, supra* at 402 U.S. 20–21, 91 S.Ct. 1267, 28 L.Ed.2d 569–570. Special attention should be given to the closing of schools which might have appeared likely to become racially mixed as a result of changes in neighborhood residential patterns. Such closings are especially indicative of segregative intent where accompanied by the construction of new schools in the areas of white suburban expansion farthest from minority population centers in order to maintain the separation of ethnic groups with a minimum departure from the principals of "neighborhood zoning". *Id.*

At the trial of the instant cause, Plaintiffs adduced evidence related to the closings of a number of schools during the period 1925 to 1973. However, as set out in Findings of Fact Nos. 46 through 49, Plain-

26. Bus route 3, trips 1, 2 and 3, transported 140 students in 1969–1970 from the Fort Bliss area to Logan Elementary School, a predominantly Anglo-American school, while Burnet Elementary School, a predominantly Mexican-American school was .5 mile closer to the area in which the students lived. (C.P.T.Exh. 8; P.Exh. 151H)

27. a. In 1969–1970, bus route 8, trips 1 and 2, transported 101 students from the predominantly Anglo-American area just west of the Fort Bliss Golf Course and near the Logan Elementary School to Burgess High School, a predominantly Anglo school, rather than transporting them to Austin High School, a predominantly Mexican-American school, which was 3.4 miles closer to their residences. (C.P.T. Exh. 9)

In 1969–1970, bus route 9, trip 1, transported 71 students residing within the bounds of Airport Road, Haan Road, Pershing Road, Forrest Road and Ricker Road to Burgess High School, a predominantly Anglo-American school, when Austin High School, a predominantly Mexican-American school, was 1 mile closer to the residences of those students who lived in the area bounded by the following streets: Jeb Stuart Road, Haan Road, Pershing Road and Forrest Road. (C.P.T.Exh. 10)

c. In 1969–1970, bus route 16, trip 1, transported to Burgess High School 71 students living in an area on Fort Bliss bounded by the following streets: Airport Road, Ricker Road, Forrest Road, Pershing Road, Pershing Circle, Sheridan Road, Pleasanton Road and Robert E. Lee Road. The distance from the intersection of Pleasanton Road and Robert E. Lee Road to Burgess High School is approximately 3.4 miles, while the distance from that point to Austin High School is approximately 1.51 miles. (C.P.T.Exh. 13)

d. In 1969–1970, bus route 17, trip 1, transported 53 students to Burgess High School from the area south of Fred Wilson Road, north of Hayes Avenue, and east of Dyer Street. The distance from the intersection of Sheridan Road and McCullough Road to Burgess High School is approximately 6.1 miles while the distance from that point to Austin High School is approximately 1.9 mile. (C.P.T.Exh. 14)

e. In 1969–1970, bus route 20, trip 1, transported 45 students from the area bounded by Sommerville, Haggerty Road, W. S. McNair Road, Marshall Road to Burgess High School. The distance from the intersection of Sommerville Road and Marshall Road to Burgess High School is approximately 5.3 miles, while the distance from that point to Austin High School is approximately 2.28 miles. (C.P.T.Exh. 15)

28. C.P.T.Exh. 28, Memorandum from Hibbard Polk, Associate Superintendent for Administration, July 26, 1976.

tiffs have failed to prove that these closings constituted any part of a design by the Defendant School District to maintain or foster segregation of Anglo-American and Mexican-American students.

## PERSONNEL PRACTICES

Evidence adduced at trial indicates that the Defendant School System historically pursued deliberately segregative policies in the personnel area until the 1960's. It is readily apparent to the Court that the effects of these past discriminatory policies in the personnel area are not so attenuated as to be of no present consequence. However, in its 1972 agreement with the United States Department of Health, Education and Welfare, the Defendant School District undertook to abate the segregative effects of its past personnel practices.

The 1972 accommodation with HEW established for the Defendant School District the goal of attaining a racially balanced teaching staff by September, 1977. This racial equalization was to be accomplished by the hiring of 160 minority teachers annually over the five-year period commencing September, 1972, allowing a variance of 5% to 10%.[29] It is now evident, despite the intensified recruitment of minority teachers from 1972 to the present, that the Defendant School District has been unable to meet the hiring goals set in the 1972 agreement.

The Fifth Circuit, in *Singleton v. Jackson Municipal School District,* 419 F.2d 1211 (1970) [hereinafter *Singleton*] has enunciated the proper standards to be applied in desegregation cases for determining the need for desegregation of faculty and other staff. Principals, teachers, teacher-aides, and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Mexican-American students or Anglo-American students. Recognizing that Spanish-surnamed Americans consti-

tute nearly 60% of the student population of the El Paso Independent School District, *Singleton* dictates that the minority teacher percentage systemwide and at each school should approach 60% of total faculty and teaching staff. However, the present systemwide minority teacher percentage within the El Paso Independent School District is 34.5%,[30] and a realistic application of *Singleton* in light of this systemwide percentage indicates that minority group members should comprise 32% to 36% of the faculty of each school within the Defendant School District. *Singleton,* 419 F.2d 1211, 1217–1218.

As set out in Findings of Fact 79 through 84, it is apparent that the majority of schools within the Defendant School District are either under-represented by both Spanish-surnamed students and Spanish-surnamed teachers or over-represented by both Spanish-surnamed students and Spanish-surnamed teachers. As of October 2, 1975, the faculty of only one high school in the Defendant School District fell within the *Singleton* tolerance range calculated in light of a systemwide minority teacher percentage of 34.5%; Jefferson High School, a predominantly Mexican-American high school, had at that time a minority faculty percentage of 36%. Bowie High School, a predominantly Mexican-American high school, had a minority faculty percentage of 38%, a figure which exceeded the *Singleton* tolerance standard for that school. The two other predominantly Mexican-American high schools fell below the *Singleton* range for the respective schools: Austin High School 21% and El Paso High School 21%. As of October 2, 1975, the faculty ratios of all four predominantly Anglo-American high schools fell below the *Singleton* tolerance range: Andress High School 23%, Burgess High School 24%, Coronado High School 22%, and Irvin High School 25%.[31]

As set out in Finding of Fact 81, as of October 2, 1975, 22 schools in the Defendant

---

**29.** D.Exh. F–19.

**30.** C.P.T.Exh. 1, Ethnic-Sex Distribution Sheet of Teachers Assigned to Schools, Oct. 2, 1975; testimony, Elmer Russell.

**31.** Statistics taken from C.P.T.Exh. 1.

School System had minority teacher percentages that fell below the *Singleton* tolerance range. Thirteen school faculties were within the tolerance range and the faculties of 27 schools exceeded the *Singleton* tolerance range. Of the 22 schools whose faculty ratios fell below the *Singleton* tolerance, 68% or 15 were predominantly Anglo-American schools; 85% or 23 of the 27 schools whose faculty ratios exceeded the *Singleton* tolerance standard were predominantly Mexican-American Schools.[32]

In its 1972 agreement with the Department of Health, Education and Welfare, the Defendant School District committed itself to the "development of a long-range plan which will offer an equal opportunity to all qualified staff for advancement into all levels of the school system". As established in Findings of Fact 63–77, the Defendant School District has failed to meet the goals set in its 1972 agreement with HEW. For the academic years 1974–1975 and 1975–1976 the percentage of Mexican-American personnel employed in top administrative management positions fell below 30% with the exception of the category delineated for officials, administrators and managers, which percentage reached 30.9% in 1975–1976.[33] As established in Findings of Fact 69 through 77, the Defendant School District has similarly fallen short of the *Singleton* Tolerance range for Mexican-American personnel holding positions within the Defendant School District as principals and assistant principals. In 1972 the HEW Report noted that the percentage of minority faculty members and administrators was disproportionately low in relation to the number of available minority personnel and in view of the fact that minority students accounted for approximately 60% of the Defendant School District's enrollment.[34] The 1972 agreement between the Defendant School District and the Department of Health, Education and Welfare established as a goal the attainment of a racial balance of approximately 60% Mexican-American to 40% Anglo-American teaching personnel by September 1, 1977.[35] The Defendant School District is far short of achieving this goal.

## CURRICULA

Plaintiffs have alleged that the El Paso Independent School District has historically maintained a different and inferior curriculum at Mexican-American schools and for Mexican-American students. At the trial of this cause, however, Plaintiffs failed to adduce sufficient evidence to support a finding that the Defendant School District has historically discriminated against Mexican-American students in the area of school curriculum. To the contrary, Defendants, as evidenced in Findings of Fact 86 through 98, have demonstrated that at least since 1972 the El Paso Independent School District has maintained a virtually exemplary policy in the area of school curricula. Course offerings span all ranges of academic ability and subject matter diversity and the School District's high school curricula was recognized in 1972 by the Southern Association of Colleges and Schools to be among the most comprehensive in the State of Texas.[36]

## FACILITIES

Plaintiffs herein have sought to prove discriminatory intent on the part of the Defendant School District in the maintenance of disparate facilities for Anglo-American and Mexican-American students. The law is clear that the recognition of a majority or a minority school, according to the quality of a school building and equipment may be an indicator of segregative design. *Swann, supra,* 402 U.S. at 18, 91 S.Ct. 1267, 28 L.Ed.2d at 568.

As set out in Finding of Fact 99, the El Paso Independent School System has historically maintained inferior facilities for Mexican-American students. However, since 1961 the Defendant School District has ex-

32. *Id.*

33. P.Exh. 151R; C.P.T.Exh. 20.

34. D.Exh. F–11, letter from Dr. Dorothy Stuck, Regional Director, Office of Civil Rights, U. S. Department of HEW to Dr. H. E. Charles, Superintendent, EPISD, at 4, June 13, 1972.

35. D.Exh. F–19, at 28; testimony Elmer Russell.

36. Testimony, K. Allen Johnson.

pended substantial sums of money to upgrade and equalize the quality of all facilities for all students.

In an effort to equalize the quality of facilities throughout the school system, in 1961 the Defendant School District initiated a campaign of construction, renovations and additions as follows:

A. The Defendant School District has spent approximately $16,309,000 on construction, renovations and additions for the 31 elementary and intermediate schools that are now predominantly Mexican-American in student composition.[37]

B. The Defendant School District has spent approximately $12,804,000 since 1961 on construction, renovations and additions for the four high schools that are predominantly Mexican-American in student composition: Austin High School, Bowie High School, El Paso High School and Jefferson High School.[38]

C. The Defendant School District has spent approximately $17,879,000 since 1961 on construction, renovations and additions for the twenty elementary and intermediate schools that are today predominantly Anglo-American in student composition.[39]

D. Defendant School District has spent approximately $9,052,000 since 1969 on construction, renovations and additions for the four high schools that are today predominantly Anglo-American in student composition: Andress High School, Burgess High School, Coronado High School and Irvin High School.[40]

▪ The renovation and modernization of older buildings to meet the functional requirements of educational programs is not, as alleged by Plaintiffs, an indication of discriminatory intent on the part of the School District. A new school building does not necessarily contain better teaching facilities than a renovated building.[41] Economic realities often dictate that renovation of old buildings, as opposed to construction of all-new facilities, is an entirely proper way to meet the changing needs of a school district.[42] The fact, then, that there is a correlation between the greater age of a school and the larger percentage of Spanish-surnamed students enrolled in a given school, is not indicative of any design to create or maintain a dual school system.[43]

▪ Plaintiffs have alleged that the four predominantly Mexican-American schools—Austin, Bowie, El Paso and Jeffer-

37. D.Exh. D, Summary Sheet for Major Construction, 1955–1975, and Distribution Sheet of All Major Construction Including Renovations, Additions, etc., since 1955.

38. D.Exh. D.

39. D.Exh. D.

40. D.Exh. D.

41. Defendants' Witness, H. L. Schieman, testified that some of the renovated campuses with auditoriums have better facilities than the Defendant School District can afford to build at the present time.

42. H. L. Schieman testified that the School District cannot afford to abandon a building that can be renovated and modernized to meet the functional requirements of present educational programs. He cited by way of example El Paso High School, completed in 1916 at a cost of $2,000,000. To rebuild El Paso High School at

present construction prices would cost between $30,000,000 and $50,000,000. He testified that his department does not differentiate between Mexican-American and Anglo-American schools. The School Board provides standard facility development in all curriculum areas, and does not distinguish between older buildings newly renovated or new buildings recently constructed. All remodeling or renovation efforts strive to conform as close as possible to the standard concepts of a renovated facility or a new facility.

43. D.Exh. C, supra n. 73; D.Exh. D, supra n. 69; and the testimony of H. L. Schieman, supra n. 74. The Court believes that the comparison of student density and the percentage of Spanish-surnamed students, in the years 1969–1970 and 1974–1975, as set forth in P.Exh. 511A–B, Comparison of Student Density in Spanish-surnamed Students, 1969–1970, 1975–1976, is not relevant to the issue of educational opportunity.

son—were consistently more crowded than the four predominantly Anglo-American high schools—Andress, Burgess, Coronado and Irvin—during the school years 1969–1975.[44] The Court believes that this allegation was insufficiently supported by evidence at trial and, further, that the contention was affirmatively disproved by Defendants' evidence.[45]

In spite of the School District's post-1961 construction and renovation campaign, there remains one area where all facilities are not equal. The assembly areas and administrative areas of all El Paso Independent School District Schools are air conditioned (partial air conditioning): eight predominantly Anglo-American schools are completely air conditioned, while only three predominantly Mexican-American schools are completely air conditioned.[46] While this disparity might be viewed as an indication of discrimination directed at Mexican-American students, the Court finds that in the areas of construction, maintenance and renovation of schools the Defendant School District has not manifested any segregative design since 1961–1962. Additionally, Plaintiffs failed to adduce sufficient evidence at trial to support a finding that the Defendant School District has pursued a policy of providing disparate facilities in areas other than physical plant.

## PLAINTIFFS' ADDITIONAL ALLEGATIONS

At the outset of this Opinion the Court listed five additional areas where the Plaintiffs claim that the El Paso Independent School District has acted with segregative intent directed at Mexican-American students. At the trial of this cause Plaintiffs failed to adduce sufficient evidence to support findings favorable to Plaintiffs in the following areas:

(1) Alleged disproportionate assignment of Mexican-American students to

classes for the mentally retarded; and

(2) Alleged participation by the Defendant School district in the decision making processes for public zoning and highway placement, racial and exclusionary restrictive covenants, segregatory family relocations, and segregatory public housing construction site selection.

With regard to Plaintiffs' allegation that the Defendant School District assigns Mexican-American students to classes for the mentally retarded in disproportionate numbers, Defendants have, as established in Finding of Fact No. 95, taken great pains to assure that the rights of children assigned to special education classes are thoroughly safeguarded. The Appendix filed concurrent herewith contains a detailed discussion of the "Plan A" program for students with special learning problems, and in light of the Defendant's convincing testimony in this area, the Court cannot find that there is any merit to the Plaintiffs' allegations. Similarly, and as set out in Finding of Fact 56, there is no merit to Plaintiffs' allegation that the School District has participated in discriminatory actions or omissions in the areas of public zoning and highway placement, racial and exclusionary restrictive covenants, segregatory family relocations, and segregatory public housing site selection.

Plaintiffs alleged but failed to adduce sufficient proof at trial to support a finding that Mexican-American students in segregated Mexican-American schools have lower achievement test scores and are more likely to drop out, be retained, suspended or expelled, than are Anglo-American students. To the contrary, the Defendant has affirmatively established that while children of Mexican descent may in fact have a higher dropout or suspension rate than Anglo-American students, this is in no way the

---

**44.** P.Exh. 512, Overcrowding in Predominantly Mexican-American High Schools.

**45.** Testimony. Plaintiffs' witness, Carlos Vela, concerning use of portable classroom buildings

by Defendant School District; testimony, Dr. Hibbard Polk, concerning use of portable buildings by Defendant School District.

**46.** Testimony, H. L. Schieman.

result of discriminatory actions on the part of the Defendant School District. Also, although achievement test scores of some predominantly non-English speaking students are lower than those of predominantly English speaking students, the discrepancy is partially attributable to the verbal orientation of standardized testing techniques, and is not an indication of discriminatory intent on the part of the Defendant School System.

 With regard to the Plaintiffs' allegation that the Defendant School District has historically maintained separate athletic districts for Mexican-American and Anglo students, Plaintiffs have successfully proven this allegation. However, as set out in Finding of Fact No. 40, the Defendant School District in 1976 fully integrated all of its athletic programs, thereby vitiating the segregatory effect of such separation. Similarly, Plaintiffs have proved that the Defendant School District historically failed to utilize bilingual communications with the parents of Mexican-American students. Any discriminatory effects of this historical policy have been ameliorated by the School District's implementation of bilingual communications with the parents of students. As set out in Finding of Fact No. 39, all report cards issued by the Defendant School District, with the exception of high school report cards, are now written in both English and Spanish. Additionally, the Defendant School District utilizes numerous other bilingual communications. In a related area, as set out in Findings of Fact Nos. 90 and 91, the Defendant School District has been involved in bilingual education programs since 1970. A bilingual program is now operational in 45 schools with an additional grade being added to the program each year.

## CONCLUSION

At the outset of this Opinion, the Court attempted to elucidate both the substance of the Plaintiffs' allegations herein and the legal precepts and norms against which the Plaintiffs' proof must be judged. After a careful review of the evidence adduced by Plaintiffs at the trial of this cause, the Court is convinced that Plaintiffs have crossed the threshold contemplated by *Keyes*; that is, Plaintiffs have successfully demonstrated that the Defendant School District has effectuated intentionally segregative policies in a meaningful portion of the El Paso School System. As set out in the discussion above and the Findings of Fact filed herewith, the Plaintiffs' evidence demonstrates a past or historical segregative design on the part of Defendants in virtually all areas and aspects of the School System. Plaintiffs have further proved a very limited present and continuing duality in the areas of school siting and construction, transportation and assignment of students, and personnel.

 Plaintiffs' *prima facie* showing of intentionally segregative actions in a meaningful portion of the El Paso School System thrusts upon the Defendant the burden of demonstrating that the extant level of systemwide segregation is not the result of purposefully discriminatory action on the part of the Defendant School District. It is the Court's belief that several important factors justify the conclusion that Defendants have successfully shouldered their burden.

 In determining segregative intent, the Court may look to both acts and omissions on the part of a defendant school district. *United States v. Texas Education Agency,* 532 F.2d 380, 389 (5th Cir. 1976). *Keyes* instructs us that the refusal of school authorities to take affirmative action to desegregate may be probative of segregative intent; conversely, then, affirmative steps taken to effectuate desegregation should be considered as indicative of good faith on the part of school authorities. *Keyes, supra,* 413 U.S. at 230, 234, 93 S.Ct. 2686, 37 L.Ed.2d at 575, 578. In this regard, Defendants adduced clear and convincing evidence at trial tending to show the early dismantling of an existing dual school system following the Supreme Court's decision in *Brown v. Board of Education.* Similarly, within the past fifteen years the Defendant School District has undertaken the imple-

mentation of significant programs intended to equalize educational opportunities for all students within the Defendant School District. These programs, discussed at length in this opinion and in the Findings of Fact, specifically refute the Plaintiffs' allegations in the areas of facilities and curriculum. Additionally, under the terms of the 1972 Agreement with the Department of Health, Education and Welfare, Defendants have attempted, albeit with only partial success, to remedy inequities in the areas of teaching personnel and administrative staff. The fact that such remedial programs are necessary, though probative of segregative intent, is not, in the opinion of the Court, determinative.

■ Past segregative acts on the part of the Defendant School District, even though remote in time, may be considered an indication of present segregative design where the segregation arising therefrom continues to exist. *Keyes, supra,* 413 U.S. 210, 211, 93 S.Ct. 2686, 37 L.Ed.2d 564. However, at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention. *Id.* As applied to the Plaintiffs' allegations and proof of past segregative actions on the part of the Defendant School District, the Court is convinced that, with the exception of the limited areas of present segregation which constitute Plaintiffs' *prima facie* case, the extant level of segregation within the El Paso Independent School District may not be attributed to past segregative design on the part of school authorities. Rather, and as established in the Findings of Fact, the existing level of segregation within the El Paso Independent School District is the result of geographic and demographic factors unique to the El Paso area.

Though the Court is convinced that the El Paso School System may not be labeled a dual school system, the Court yet must deal with the actual inequities and discrimination proved by Plaintiffs in establishing their *prima facie* case. These limited areas of discrimination, discussed at length in this opinion, are the extent of present discrimination within the El Paso Independent School District. Though if judged on a systemwide scale these acts may appear isolated and insignificant, they are, in the Court's opinion, violations of constitutional magnitude as that standard is defined in *Keyes.* Although the Court recognizes that the Defendant School District has taken affirmative steps to remedy that discrimination illustrated by Plaintiffs' evidence in this cause, the Court believes that certain remedial measures must be prescribed in order to insure that all students within the El Paso Independent School District are provided with equal educational opportunities.

### REMEDY

■ In formulating a remedy for the inequities proved by Plaintiffs at the trial of this cause, this Court is mindful of the Supreme Court's cautionary words in *Milliken v. Bradley*: "A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, '[A]s with any equity case, the nature of the violation determines the scope of the remedy.' " [47] Thus, this Court must sculpt a remedy which conforms to the level of identifiable violations of constitutional rights found herein.

It seems clear that Defendant School District must be required to ameliorate the segregative effects inherent in the construction of both the new Bowie High School and Roberts Elementary School. For Bowie High School, the Defendant School District must establish a transportation system which permits any student residing within the Bowie High School attendance zone to enroll in and be transferred to either Andress High School, Burgess High School, Coronado High School, or Irvin High School, as the individual student may request. Further, the transportation

**47.** *Milliken v. Bradley,* 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974), quoting *Swann,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

system thus established must permit any student residing within the attendance zone of the four predominantly Anglo-American high schools to be enrolled in and transported to Bowie High School, again as the individual student may request. The cost of this transportation system must be borne by the Defendant School District. Such an optional majority-to-minority transfer program, with the state providing free transportation to desiring students, is clearly a helpful adjunct to a desegregation plan. *See Swann, supra,* 402 U.S. at 26–27, 91 S.Ct. 1267, 28 L.Ed.2d 572.

The Defendant School District must seek to eliminate the ethnic isolation of students at Roberts Elementary School by redrawing the attendance zones of Roberts, Lincoln Elementary-Intermediate School, Carlos Rivera Elementary School, White Elementary-Intermediate School and Putnam Elementary School. If redistricting will not serve to equalize the percentage of Mexican-American students attending these schools, the Defendant School District must establish a mandatory transportation system among these schools to accomplish that end. There are several reasons why a mandatory transportation system would be proper in the Roberts Elementary School situation, while a voluntary transportation system is appropriate in the Bowie High School situation. First, the number of students involved at Roberts would be fewer than at Bowie. Second, the distance to be traveled between Roberts Elementary School and any of the four predominantly Anglo-American schools in northwest El Paso would be significantly shorter than the distance between Bowie and any of the four predominantly Anglo-American high schools in El Paso. Finally, since fewer students are involved and distances are shorter, a mandatory transportation system for Roberts Elementary School would cost significantly less than a similar system for Bowie.

The Court is aware that busing is but one tool of school desegregation. And, although busing may foster a degree of desegregation, it may infringe upon community aspirations and personal rights and divert resources from quality education. *Keyes, supra,* 413 U.S. at 242, 93 S.Ct. 2686, 37 L.Ed.2d at 582 (Mr. Justice Powell concurring and dissenting). This Court believes that less drastic measures are preferable wherever feasible to accomplish desired ends. Therefore, and in lieu of a mandatory transportation system, the Defendant School District must seek to remedy segregation at Dowell Elementary School and Schuster Elementary School by redrawing the attendance zones of those schools to equalize the percentage of Mexican-American students at each school. Similarly, the Defendant School District must redraw the attendance zones of Travis Elementary School and Bliss Elementary School to equalize the percentage of Mexican-American students in those schools. Further, the Defendant School District must redraw the attendance zones of the following high schools to accomplish the following ends:

(1) The attendance zone of Austin High School to include the Fort Bliss Military Reservation;

(2) The attendance zones of Irvin High School and Jefferson High School to accommodate students presently attending Austin High School who will be displaced by the influx of Fort Bliss students into Austin High School; and

(3) The attendance zone of Burgess High School to accommodate students presently attending Jefferson High School who will be displaced by the influx of those students presently attending Austin High School.

As discussed *supra,* the Defendant School District maintains several school bus routes which presently serve to isolate Mexican-American and Anglo-American students. Accordingly, the Defendant School District must redirect those students on Bus Route 3 from the Logan Elementary School to the Burnet Elementary School. Similarly, students transported on Bus Routes 8, 9, and 16 must be redirected from Burgess High School to Austin High School in order to

eliminate segregation caused by the utilization of these bus routes.

This Court, in its discussion *supra,* found no disparity in the quality of facilities provided at predominantly Anglo-American and predominantly Mexican-American campuses. The only existing inequality was in the number of completely air conditioned schools. Consequently, the Defendant School District must increase the number of predominantly Mexican-American schools that are completely air conditioned to equal the number of predominantly Anglo-American schools that are completely air conditioned, and thus eliminate any discriminatory discrepancy in the area of facilities.

As discussed *supra,* the Defendant School District and the United States Department of Health, Education and Welfare, on August 15, 1972, entered into an agreed plan to remedy deficiencies found by the Department of HEW in the following areas: special education, minority teacher recruitment, teacher reassignment, and promotion of minority personnel to administrative and supervisory positions. The Defendant School District has, despite good faith efforts on its part, failed to meet the goals set in the 1972 agreement and has further failed to meet the standards for hiring and reassignment of minority personnel mandated in *Singleton v. Jackson Independent School District,* 419 F.2d 1211 (5th Cir. 1970). Therefore, the Defendant School District must recruit a sufficient number of qualified bilingual-bicultural teachers to achieve the goal of racial balance set out in the HEW Agreement, with special emphasis on the hiring of additional qualified Mexican-American high school teachers. The hiring program mandated herein must be conducted with emphasis upon immediate attainment of the *Singleton* standards as to assistant principals-teaching, elementary-intermediate school assistant principals, intermediate school assistant principals, other classroom teachers, librarians and audio-visual staff, and psychological services personnel. The Defendant School District must assign Anglo-American teachers to each predominantly Mexican-American school and Mexican-American teachers to each predominantly Anglo-American school to conform with the *Singleton* tolerance standard. In conjunction with this reassignment policy, Mexican-American high school teachers must be reassigned from Bowie High School to other high schools within the school system in order to reduce the percentage of Mexican-American faculty at Bowie High School from 38% to 32%. Also in the personnel area, the Defendant School District must begin promoting qualified minority personnel to the following positions: officials, administrators and managers, assistant principals, consultants and supervisors of education, and "other professional staff" positions, as contemplated in the 1972 HEW Agreement.

## ORDER

ACCORDINGLY, IT IS ORDERED, ADJUDGED AND DECREED that the Defendant, El Paso Independent School District shall present a plan to this Court on or before March 28, 1977, incorporating the following:

1. The establishment of a transportation system whereby any student presently attending Bowie High School may voluntarily attend Andress High School, Burgess High School, Coronado High School, or Irvin High School, and any student attending any one of those four high schools may voluntarily attend Bowie High School. The cost of this voluntary transportation plan shall be borne by the El Paso Independent School District, and the plan shall be effective as of August 15, 1977.

2. The redrawing of the attendance zones of Roberts Elementary School, Lincoln Elementary-Intermediate School, Carlos Rivera Elementary School, White Elementary-Intermediate School and Putnam Elementary School, and/or the establishment of a mandatory transportation system among those schools to equalize the percentage of Mexican-American students attending each school. This shall be effective as of August 15, 1977.

3. The redrawing of the attendance zones of Dowell Elementary School and

Schuster Elementary School to equalize the percentage of Mexican-American students in those schools. This shall be effective as of August 15, 1977.

4. The redrawing of the attendance zones of Travis Elementary School and Bliss Elementary School to equalize the percentage of Mexican-American students in those schools. This shall be effective as of August 15, 1977.

5. The redrawing of the attendance zone boundary between Austin High School and Burgess High School to remove the Fort Bliss Military Reservation from the Burgess High School attendance zone and include it in the Austin High School attendance zone. This shall be accompanied by: (1) redrawing the attendance zone of Irvin High School and Jefferson High School so as to accommodate the students presently attending Austin High School who will be displaced by the influx of the Fort Bliss students into Austin High School; and (2) redrawing the attendance zone of Burgess High School to accommodate those students presently attending Jefferson High School who will be displaced by the influx into Jefferson High School of students presently attending Austin High School. This shall be effective as of August 15, 1977.

6. The transportation of those students on bus routes 8, 9 and 16 to Austin High School instead of to Burgess High School. This shall be effective as of August 15, 1977.

7. The transportation of those students on bus route 3 to the Burnet Elementary School. This shall be accompanied by a redrawing of the boundaries of Logan Elementary School so as to accommodate those students from Burnet Elementary School who will be displaced by the influx of Fort Bliss students into Burnet Elementary School. This shall be effective as of August 15, 1977.

8. Increasing the number of predominantly Mexican-American schools that are completely air conditioned to equal the number of predominantly Anglo-American schools that are completely air conditioned. This shall be effective by August 15, 1981.

9. The recruitment of sufficient qualified bilingual-bicultural teachers and administrative personnel to achieve the racial balance set forth in the 1972 HEW Agreement (D.Exh. F–19, p. 28) with special emphasis on the hiring of additional qualified Mexican-American high school teachers. This hiring program shall be conducted with further emphasis upon immediately attaining the *Singleton* standards as to assistant principals-teaching, as set forth in Court Post Trial Exhibit 20, EEO–5, May 19, 1976; as to elementary-intermediate school assistant principals, as set forth in Court Post Trial Exhibit 22, Roster of principals and assistant principals for 1976; as to intermediate school assistant principals as set forth in Court Post Trial Exhibit 22, *supra*; as to other classroom teachers as set forth in Court Post Trial Exhibit 20, *supra*; as to librarians and audio-visual staff as set forth in Court Post Trial Exhibit 20, *supra,* and as to psychological services personnel, as set forth in Court Post Trial Exhibit 20, *supra.* This shall be effective as of August 1, 1978.

10. The assignment of Anglo-American teachers to each predominantly Mexican-American school and Mexican-American teachers to each predominantly Anglo-American school to meet the *Singleton* tolerance standard, including the assignment of Mexican-American high school teachers from Bowie High School to Andress High School, Austin High School, Burgess High School, Coronado High School, El Paso High School or Irvin High School in order to reduce the percentage of Mexican-American faculty at Bowie High School from 38% to 32%. This shall be effective as of August 15, 1978.

11. The promotion of qualified minority personnel to the following positions: officials, administrators and managers, assistant principals, consultants and supervisors of education, and "other professional staff" positions as set forth in Plaintiffs' Exhibit 151R, EEO–5, 1974–1975, and Court Post Trial Exhibit 20, *supra,* in order to comply with the 1972 HEW Agreement, Defendants' Exhibit F–19, p. 31. This shall be effective as of September 1, 1977.

## APPENDIX I

The Defendant School District has taken great pains to assure that the rights of children assigned to special education classes are thoroughly safeguarded. What follows is a description of the El Paso Independent School District's "Plan A", taken from the testimony of Dr. Joseph Ptasnik.

"Plan A" is a state-funded program designed to diagnose the educational needs of exceptional children and provide for those needs through sophisticated special education techniques, specially trained teachers, psychologists, diagnosticians, and other support personnel. The goal of the program is to integrate the exceptional child into normal classroom routine. As of October 1, 1975, 4,800 students were involved in "Plan A" programs. Of this number, 60% were Spanish-surnamed, a figure identical to system-wide representation of Spanish-surnamed students. In the school year 1974–1975, 932 children were programmed out of "Plan A". In that year a total of 5,200 children were served. At the time of trial approximately 10% of the school system was being served under the "Plan A" program.

A student may be channeled into "Plan A" by one of several routes: the regular classroom teacher may notice a student's behavioral or learning difficulty; a local physician may refer a child to the school system; or parents may recognize that their child has a learning deficiency. Once a child is referred, he is brought to the attention of the special education support staff which exists in each of three areas of the city and operates under the appropriate superintendent for that area. This support staff consists of a consultant, a special education diagnostician, a school psychologist, and a special education counselor-aide. Normally, the counselor-aide or the consultant visits the child's home and conducts an interview in the language of the parents to determine whether the child's problems are caused by the home environment, the school environment, or a combination of both. Where a further evaluation of the child by public school personnel is needed and/or information in the possession of other agencies that might have treated the child is required, written permission for further inquiry is sought from the child's parents. The child is then examined by a qualified médical practitioner whose fee is paid by the public schools, if the child's parents cannot afford the cost of the examination.

At this point, a state-certified educational diagnostician evaluates the child in his native tongue, either Spanish or English. All the data is then collected and collated and the School Admissions Review Dismissal Committee, composed of those people involved in the appraisal process review, discusses the collected data and the individual strengths and weaknesses of the subject child. The Committee determines the child's educational needs and which El Paso Independent School District resources would best meet those needs. The Committee's decision is in writing and signed by all members of the group. If a parent does not agree with the recommendations of the Admissions Review Dismissal Committee, the process is immediately terminated and no services are provided for the child. According to the Administrative Guide and Handbook for Special Education, revised in 1973, minority group students cannot be assigned to special education classes solely on the basis of English language ability. The entire investigative process provides a safeguard against this occurrence.

Each area of the City of El Paso has a "Plan A" Parent-Advisory Council composed of the parents of children who are participating in the "Plan A" program. The Council meets on a monthly basis with the area superintendent and the area "Plan A" supportive staff to consider the specific special education needs for that part of the city. This monthly meeting provides a grass roots monitoring of the plan's direction by the parents of the children involved in the plan.

Once in the program, a child spends one-half of each day participating in his individual curriculum in the resource room which exists on every campus. He spends the other half of his day in the regular school

curriculum. A quarterly progress report is compiled on each student and the student's educational program is changed as warranted. The child's progress is reviewed annually in the spring and a determination is made to consider the child's program or modify it. A child's parents may attend this meeting if it involves a substantial change in program.

The designation "EMR", or educable mentally retarded, was the only category used by the Defendant School District prior to 1970 to designate students with learning disabilities. Difficulty with the reading process is one characteristic of the EMR child. In 1970, children with reading difficulties participated in a self-contained program. Today there are no special EMR classes. All students participating in "Plan A" use the resource rooms and in any given period there may be children in the resource room with various educational and emotional problems.

Pursuant to a directive from the Department of Health, Education and Welfare, in 1973–1974 the El Paso Independent School District thoroughly re-evaluated the selection process for "Plan A" candidates. Upon evaluation of all students in their native tongues, 90% of the students remain in the program.